**WILLIAMS et al. v. GENERAL MILLS, Inc.**

No. 4538.

District Court, N. D. Ohio, W. D.

July 3, 1941.

Edward O. Lamb and Lowell Goerlich, both of Toledo, Ohio, for plaintiff.

Leland L. Lord, of Toledo, Ohio, and Richard T. Angell, of Minneapolis, Minn., for defendant.

PICARD, District Judge.

This is an action brought by Samuel Williams "on behalf of himself and other employees of defendant similarly situated" v. General Mills, Inc., to recover "stipulated damages" for failure of defendant to observe the provisions of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq.

Plaintiff, Samuel Williams and three others were watchmen and one John Moreo was a maintenance man during the summer months and a watchman during the winter months at defendant's Larrowe plant near Toledo, Ohio.

Just two days prior to the effective date of the Fair Labor Standards Act (October 24th, 1938) defendant's superintendent, on instructions from its main office, met with the watchmen and advised them that the company would either have to reduce their hours to 40 per week paying them the same money per hour, or if they desired to continue working 56 hours a week, then the company would reduce their pay from 60 to 52½ cents an hour for the first 40 hours and time and one-half thereafter. In other words, the men were getting 56 hours at 60 cents an hour. Under the Fair Labor Standards Act they must get time and one-half for overtime over 44 hours. The company wanted to pay the men what they were then getting or $33.60 a week. The men wanted to get this and were willing to work 56 hours "if it was legal" for the company to make such an arrangement. There is no denying that this was an attempt, by contract, to circumvent the purpose of the Fair Labor Standards Act by reducing wages, maintaining the same number of hours and giving the workman the same pay that he was receiving before the act went into effect. No one disputes this, and the question simply is: Did defendant company have the right to enter into a contract with its men previous to the effective date of the Fair Labor Standards Act as long as the minimum rate paid was not below the minimum rate set by the act? It is admitted that 52½ cents an hour is above the minimum.

In this particular case plaintiffs were members of the A. F. L. labor union which union, through its committee, negotiated with the company but as affecting plaintiffs these negotiations were rather vague. The superintendent talked with the men themselves at eleven o'clock at night. There was some doubt in the minds of the men that the attempted action of the company was legal. They were assured that it was. They accepted the new arrangement "for the time being". They were but five rather obscure members of the union and changes in rates of pay and working conditions affecting all employees of defendant's Larrowe plant were usually posted. If the new arrangement was acceptable to the watchmen it seemingly gave no source of worry to the union or the committee members who were primarily looking after the interests of employees in the other departments, more numerous and where a change in pay affected many. No injustice to the other members could be glossed over, but the five watchmen seemed to be the "forgotten men" of the union and their complaints on what had happened, if any, were not very articulate.

The action is here brought under Section 216(b), Title 29 U.S.C.A. Plaintiffs claim that this arrangement was merely a paper entry on the books of defendant; that really they were not being paid time and one-half and that the law contemplated no reduction in pay, but provided for time and one-half at the "regular rate at which he is employed", which meant in this case, 60 cents an hour. Defendant says that at the effective date of the act the "regular rate" was 52½ cents an hour. There is more than a suspicion that mathematicians of defendant company even in the computation of vacations, arrived at the result they wanted by what to all appearances was not a paper entry but nevertheless accomplished what a paper entry would accomplish. Actually, the men got the same weekly wage after the contract that they did before and their vacation pay was also the same as before. There are even one or two instances that might indicate it was entirely a paper entry, but on this point the facts do not differ materially from the two cases later referred to where contracts of this kind were upheld. We do not consider the question of whether this is or is not a "paper entry" controlling. Defendant's main argument is that under Section 218, Title 29 U.S.C.A. as long as the wages were not reduced below the minimum provided for in the act, the contract was good. It does not appear at any time that anyone told these men that they could be employed at 44 hours a week legally under the new act and they seemed to have had the alternative of taking 40 hours a week at 60 cents an hour, which would call for at least two more watchmen to be employed, or they could take the 56 hours under the "new contract".

In deciding this case it is well to bear in mind the following sections of the Act itself.

Section 207, subsection (a), Title 29 U.S.C.A. provides for the 44 hour week during the first year of the effective date of the act, 42 hours the second, and 40 hours thereafter, with time and one-half for overtime.

Section 216(b), Title 29 U.S.C.A. provides as follows: "Any employer who violates the provisions of section 6 or section 7 of this Act [206 or 207 of this chapter] shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime com-

pensation, as the case may be, and in an additional equal amount as liquidated damages. Action to recover such liability may be maintained in any court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated, or such employee or employees may designate an agent or representative to maintain such action for and in behalf of all employees similarly situated. The court in such action shall, in addition to any judgment awarded to plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."

Section 218, Title 29 U.S.C.A. in part, provides as follows: "No provision of this act [chapter] shall justify any employer in reducing a wage paid by him which is in excess of the applicable minimum wage under this Act [chapter]."

We also deem it advisable to refer to Section 202, Title 29 of the Act which relates to the "findings and declaration of policy" or purposes of this particular legislation. After reciting the necessity for an act that would cure the evils detrimental to the maintenance of the minimum standard of living "for health, efficiency, and general well-being of workers" the act goes on to say that this should be done "without substantially curtailing employment or earning power".

Apparently, Congress had determined that minimum wages and long hours in industry had led to many evils of which minimum pay was chiefly condemned while it was also recognized that long hours per week resulted in unemployment. Except in certain fields of industrial endeavor, very few who have studied the problem contend that 48 hours or more of labor per week are detrimental to health. As a matter of fact many professional and business men work longer hours every week. But if the acceptable work week could be placed at 40 hours with "overtime" mandatory for all hours over 40, then employers would, rather than pay "overtime", give work to more men, thus cutting down unemployment in general. Congress also anticipated that many industrial leaders would not be adverse to giving more employment as long as it didn't cost anything and to meet any possible circumvention the policy of the Act itself enunciated the doctrine that the eventual change to a 40-hour week should be made generally without affecting the "earning power" of the workers of the United States. Fair Labor Standards Act 1938, § 2 (b), 29 U.S.C.A. § 202 (b).

As further evidence of this intention there is the above extract from Section 218 which notifies the employer that nothing in the act "justifies" him in reducing a wage paid by him which is in excess of the applicable minimum wage under the act. In short, the real reason for the words "regular rate" in Section 216 becomes manifest.

It is this very section, however, that defendant relies upon as the basis for its right to enter into a contract with its men and it quotes in support of that position Reeves v. Howard County Refining Co., D. C., 33 F. Supp. 90; Remer v. Czaja, D. C., 36 F.Supp. 629 as well as A. H. Belo Corporation v. Street, D. C., 36 F.Supp. 907.

There is no doubt that these cases support the theory of defendant. They unequivocally accept the employee's right to contract with employer as long as the minimum pay provisions of the Act are not infringed upon. There are some distinctions but to us they are not very important. For example, the court in the Reeves case, supra [33 F.Supp. 92], mentions "We doubt if the wage and hour law was designed for cases like the one now before us." The employer was a small institution. In the Remer case, supra, the employee's wages were raised to meet the minimum requirement of the act. Grounds for some argument but rarely do we find any case on all fours with another and the distinctions here are not very great. We prefer to believe that it is "theory" and "view point" rather than distinction when you compare the above cases with McLendon v. Bewley Mills,[1] and Fleming v. Carleton Screw Products Co., D.C., 37 F.Supp. 754.

In the Remer case, supra, [36 F.Supp. 632], Judge Coleman construes Section 18 of the act in the following words: "it is reasonable to construe the clause before us as setting up a barrier against employers using the Act as a ground for breaking actual contracts".

We do not arrive at this construction. To us that paragraph is not ambiguous. It clearly shows that Congress, composed of men the majority of whom had reason to believe from past experience that there would always be a few employers who would not enter into the spirit of the intention of such legislation, had in mind that

---

[1] No opinion for publication.

minority and desired to place a barrier against the very thing that happened here. If all industrial leaders had reduced the wage rate in anticipation of this act, they would probably have found their men willing to work overtime to get the same wages. Congress knew that. They sought to prevent the act's frustration because the evil was not so much in the length of time men worked but, with nine, ten or twelve million unemployed in this country, the problem was to cut into that unemployment without financially hurting industry or its employees. It was hoped to cut at least four or five million from the unemployment ranks. This it appears was the big objective of the Wages and Hour and Fair Labor Standards Act.

■ The intention of Congress is clear and as the Supreme Court said in United States v. American Trucking Associations, Inc., et al., 310 U.S. 534, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345: "In the interpretation of statutes, the function of the courts is easily stated. It is to construe the language so as to give effect to the intent of Congress."

■ Objection is also made by defendant that Section 218 of the act does not apply to section 15(a) or 16; that there is no remedy left to the employee under a contract by which defendant reduced the wage in this manner. Citations out of the Wage and Hour Division itself are quoted recognizing that this might be an evil but advising the employee that there is no remedy. With this we cannot agree. We must look at the act as a whole and from the whole arrive at the intention of Congress. Similar attempts ·by employers to circumvent the act were stopped by the court in Fleming v. Carleton Screw Products Company, supra, and McLendon v. Bewley Mills, supra. In both of those cases it was held that the "regular rate" was what the employee had been getting, not what the new contract provided.

■ We agree with the court's statement in the Carleton case, supra [37 F.Supp. 757]: "It seems to me that the construction contended for by defendant to the effect that employer and employee may agree on a regular rate of pay regardless of what compensation the employee actually receives, will permit employers to avoid the obligations imposed by Section 7 and will completely nullify the overtime provisions therein contained."

There is another reason why we feel that plaintiffs should recover in this case.

■ First, we are mindful that the testimony shows that the employer informed plaintiffs that they were obligated to cut down to a 40-hour week. That was not the law. They could have worked 44 hours at 60 cents an hour without paying overtime the first year, 42 hours the second year and then 40 hours in the third year. So a contract that is arrived at without the true facts being before the parties is admittedly no contract at all.

■ Second, a contract that is arrived at by coercion (and that's what this in fact amounted to so far as these employees are concerned) should not receive the blessing of this court.

■ Third, a contract that seeks to circumvent the intent of Congress and admittedly so, should not be favorably construed by this or any other court. We do not deny that it is possible to reduce wages but there was not even a claim of reducing wages here. It almost amounted to a conspiracy between the men and the company against an act of Congress—the men conspired to keep others out of work and the company to refrain from paying higher wages.

■ That the union endorsed the contract, if there is a contract, is of no avail. We believe it is the object of the law that neither the union nor employer can resort to any arrangement, method, or subterfuge that would render ineffective the intent of Congress. Such a contract is against public policy. However, because of the action of the union in this case and its failure to protect its most humble members; and because of the conspiracy by the men themselves, which is not as great since they never at any time openly accepted the agreement "unless it was legal" we would not be inclined to tax costs and allow an attorney fee were it not that the provisions of the act make the same mandatory.

The costs may be taxed at $25 and a reasonable attorney fee is set at $100.

We hold that the plaintiffs may all recover.