## MISSEL v. OVERNIGHT MOTOR TRANSP. CO., Inc.

### No. 4867.

Circuit Court of Appeals, Fourth Circuit.

Jan. 5, 1942.

George A. Mahone, of Baltimore, Md. (William O. Tydings, of Baltimore, Md., on the brief), for appellant.

John R. Norris, of Baltimore, Md., and J. Ninian Beall, of Washington, D. C. (Clayton W. Daneker, of Baltimore Md., on the brief), for appellee.

John E. Skilling, of Counsel for Administrator of Wage and Hour Division, U. S. Department of Labor, of Washington, D. C., (Warner W. Gardner, Sol., and Irving J. Levy, Asst. Sol., both of Washington, D. C., Beverley R. Worrell, Regional Atty., of Richmond, Va., and Jacob D. Hyman, of Counsel for Administrator of Wage and Hour Division, U. S. Department of Labor, of Washington, D. C., on the brief), amicus curiae.

J. Ninian Beall, of Washington, D. C., and John R. Norris, of Baltimore, Md., for American Trucking Ass'n, Inc., amicus curiae.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This is an appeal from a final judgment of the District Court of the United States for the District of Maryland entered for the defendant· in an action brought by appellant, as plaintiff, to recover from appellee, defendant, unpaid overtime compensation alleged to be due under Section 7(a) of the Fair Labor Standards Act of 1938, 52 Stat. 1060–1069 (1938), 29 U.S.C.A. §§ .201–219 (hereinafter referred to as the Act), and an additional amount as liquidated damages, together with reasonable attorney's fees and costs of the action, as provided in Section 16(b) of the Act. The opinion of the District Court is reported in 40 F.Supp. 174. The case presents the problem of computation of overtime pay under the Act. Since this in turn presents questions of interpretation and rights and liabilities under the Act which are of con-

siderable public interest and importance,[1] the Administrator, pursuant to leave granted by this Court, was permitted to submit a brief as amicus curiae, and to argue the case before this Court through counsel, confining his discussion to questions of interpretation of the Act involved in this appeal.

The case was tried on the complaint, answer, amendment to the complaint, and stipulation of facts by the parties. Accordingly, we adopt the statement of facts set out in the brief for the Administrator. Defendant admitted the following facts: that the court below had jurisdiction over the parties and the subject matter; that the defendant was licensed to engage, and was engaged, in the business of motor transportation of freight in interstate commerce and had employed plaintiff in that business; that all duties performed by plaintiff for defendant were "in commerce"; that none of the duties performed by plaintiff was that of a driver, driver's helper, loader, or mechanic, as defined by the Interstate Commerce Commission in its decision of March 4, 1941, in Ex Parte MC–2 and MC–3; rather his duties were those of a rate clerk, cashier, and dispatcher; and that defendant kept no records of hours worked by plaintiff prior to June 14, 1940.

The parties agreed that plaintiff began to work for defendant on November 26, 1937, at a salary of $23 per week, plus supper money of $2.50 per week, and that after November 1, 1938, he worked for a salary of $25 per week, plus supper money of $2.50 per week, and that he worked a varying number of hours per workweek from the time his employment began, prior to the effective date of the Act, until his employment terminated on October 19, 1940. It was further agreed that in at least two workweeks during the period from October 24, 1938, to October 23, 1939, plaintiff was on duty 80 hours; that in at least three workweeks during the period from October 24, 1939, to October 19, 1940, plaintiff was on duty 75 hours. The issues raised by the pleadings as to hours worked in other workweeks were not tried or adjudicated. Plaintiff's offer of testimony was rejected by the court as unnecessary for adjudication of the controlling legal question raised by the facts agreed upon.

Plaintiff argued, in the alternative, that his regular rate of pay is to be determined either by dividing the number of hours worked each workweek into his weekly wage, or by dividing the applicable statutory maximum hours (44 or 42) into the weekly wage. Defendant contended that plaintiff was employed at a weekly salary to do a job which necessarily involved irregular hours rather than to work a fixed schedule of hours, and, therefore, the sole effect of the Act was to fix a minimum wage for all hours worked and overtime compensation at time and one-half the statutory minimum rate per hour for hours worked in excess of the statutory maximum. It was admitted by the parties that the contract of employment was not evidenced by any writing; that plaintiff was hired to work for no specific number of hours per day or week and that these hours varied greatly from day to day.

The court below found that the plaintiff's weekly wage (plus supper money) was more than the total minimum wages prescribed by the Act plus one and one-half times such minimum rate for the overtime hours actually worked by the plaintiff, and that defendant, accordingly, had not violated the Act. The court held that the overtime provisions of the Act were primarily minimum wage provisions, and were therefore satisfied if an employee was paid at time and one-half the statutory minimum rate for each overtime hour. The court's opinion is predicated on the premise that the purpose of the Act is to establish and gradually raise minimum wages, and that the overtime provisions were inserted, not to discourage or limit overtime work, but merely as part of a plan to raise substandard wages by providing definite pay for overtime work.

The pertinent section of the Act, which is the crux of this case, is Section 7(a), 52 Stat. 1063 (1938), 29 U.S.C.A. § 207(a).[2]

[1] It is estimated that the eventual outcome of this case will have a powerful impact and profound effect on many million "white-collar" workers getting more than the statutory minimum wage. See Magazine of Modern Industry, Oct. 15, 1941, p. 42. If the decision of the lower court stands, the Wage-Hour division contends it will largely eliminate the law's benefits for them.

[2] The minimum wage Section of the Act is Section 6(a), 52 Stat. 1062 (1938), 29 U.S.C.A. § 206(a), which provides:

"Every employer shall pay to each of his employees who is engaged in commerce

Section 7(a), dealing with maximum hours, provides:

"No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce—

"(1) for a workweek longer than forty-four hours during the first year from the effective date of this section,

"(2) for a workweek longer than forty-two hours during the second year from such date, or

"(3) for a workweek longer than forty hours after the expiration of the second year from such date,
unless such employee receives compensation for his employment in excess of the hours above specified at a rate *not less than one and one-half times the regular rate at which he is employed.*" (Italics added.)

■ In their oral argument before this Court, counsel for the plaintiff and counsel for the Administrator contended that Section 7(a) is primarily a maximum hours provision and hence an employer must pay one and one-half times the *actual wage* the employee is receiving for overtime. On the other hand, counsel for the defendant argued, in line with the reasoning of the lower court, that Section 7(a) is primarily a minimum wage provision and hence an employer is entitled to pay one and one-half times the statutory *minimum wage* for overtime. Thus, the important question presented on this appeal is whether "regular rate" as used in Section 7(a) means the hourly rate arrived at by dividing plaintiff's actual weekly wage by the number of hours actually worked in each workweek,[3] or whether it means the statutory minimum rate. This, of course, raises the broad question as to what the real purpose of Section 7(a) of the Act is.

■ We are unable to agree with the lower court that the primary purposes of the Fair Labor Standards Act are satisfied by the payment of time and one-half the statutory minimum wage for overtime. Furthermore, we do not believe that Section 7(a) is merely part of a broad scheme of minimum wage regulation.

*Purpose of Section 7(a) of the Fair Labor Standards Act.[4]*

■ Every statute born of economic and social pressure, attempting to harmonize discordant socio-economic forces, must be viewed in the framework of conditions

---

or in the production of goods for commerce wages at the following rates—
"(1) during the first year from the effective date of this section, not less than 25 cents an hour,
"(2) during the next six years from such date, not less than 30 cents an hour,
"(3) after the expiration of seven years from such date, not less than 40 cents an hour * * *."
Both Sections 6 and 7 became effective October 24, 1938. The flat statutory minimum of 40 cents becomes effective June 25, 1945. "A minimum wage of 40 cents will yield an annual income of $800 a year to those continually employed for 50 weeks. No fair-minded person would suggest that this amount is too much to maintain the minimum American standard of living." H.R.Rep. No. 1452, 75th. Cong., 1st Sess. (1937) 9. See also H.R. Rep. No. 2738 (Conference Report), 75th. Cong., 3rd Sess. (1938) 28.

[3] No authority has been found for plaintiff's alternative contention that regular rate of pay is to be computed by dividing the applicable statutory maximum hours (44 or 42) into the weekly wage. Accordingly, we reject this contention.

[4] Federal control over wages, hours, and working conditions is exerted under other measures besides the Fair Labor Standards Act. The Walsh-Healey (Public Contracts) Act, 49 Stat. 2036 (1936), 41 U.S.C.A. § 35, requires sellers of goods in excess of $10,000 to the United States to pay minimum wages determined by the Secretary of Labor, to observe the eight-hour day and forty-hour week, and to abstain from use of child and convict labor. The Bacon-Davis Act, 46 Stat. 1494 (1931), 40 U.S.C.A. § 276a, authorized the Secretary of Labor to establish minimum wages for employees constructing public buildings of the United States. Prior statutes had established the eight-hour day for such laborers. 37 Stat. 137 (1912), 40 U.S.C.A. § 324. The Merchant Marine Act, 49 Stat. 1992 (1936) as amended 52 Stat. 954 (1938), 46 U.S.C.A. § 1131, authorizes the Maritime Commission to fix minimum wages and working conditions for all officers and crews employed on vessels receiving "an operating differential subsidy". The Sugar Act of 1937, 50 Stat. 909 (1937), 7 U.S.C.A. § 1131, authorizes the Secretary of Agriculture to condition benefit payments upon compliance with statutory regulations of child labor, and with wage rates determined by the Secretary to be fair and reasonable.

aimed to be remedied thereby. Consequently, it is vital that the Congressional findings and declaration of policy set forth in the Act be examined with care. The findings of Congress, as set forth in Section 2(a), are that the existence in industries engaged in commerce of substandard labor conditions do not conduce to the maintenance of minimal health, living, and general welfare standards of workers employed therein; that the free flow of commerce is burdened thereby; that unfair competition, labor disputes and disorderly marketing result. The declaration of policy is unequivocally set out in Section 2(b) where it is declared to be the policy of Congress in the exercise of its commerce power to correct and eliminate these burdensome conditions without substantial impairment of employment or earning power. As was stated by the Chief Justice of the United States: "* * * the motive and purpose of the present regulation is plainly to make effective the Congressional conception of public policy that interstate commerce should not be made the instrument of competition in the distribution of goods produced under substandard labor conditions, which competition is injurious to the commerce and to the states from and to which the commerce flows." See United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 457, 85 L.Ed. 609, 132 A.L.R. 1430. The objectives of the Act, as expressed, demonstrate that the Act, comprehensive in its purpose and remedial in character, should be liberally construed. See Bowie v. Gonzalez, 1 Cir., 117 F.2d 11, 16; Fleming v. Hawkeye Pearl Button Co., 8 Cir., 113 F.2d 52, 56; Fleming v. A. B. Kirschbaum Co., D.C., 38 F.Supp. 204, 206. Only in this way can the coordination of our economic life and the elimination of unfair differentials in labor conditions be effectively achieved.[5]

▮ The President's message to Congress of May 24, 1937,[6] asserted the necessity for governmental control over maximum hours, minimum wages, the evil of child labor and the exploitation of unorganized labor. In that message, he expressed the hope that the right of the government to change working hours would decrease unemployment in those groups in which unemployment principally existed.[7] It seems plain from the legislative history of the Act[8] that, in addition to attempting to establish a decent national level of working conditions,[9] one of the fundamental purposes of the Act was to induce worksharing and relieve unemployment by reducing hours of work.[10] In Williams v. General

[5] Proponents of wage and hour legislation contend that these laws do not necessarily raise production cost and selling price. It seems to be the consensus of opinion, however, that the tendency of such laws is to increase the cost to the consumer. See Douglas, Economic Theory of Wage Regulation (1938) 5 U. of Chi. L. Rev. 184. "The fixation of wages has been justified by the administration and its supporters on three grounds, namely, that: (1) it was necessary to protect workers from the pressure of competition, or from the combination in wage matters of monopoly; (2) it was desirable to check downward spirals of wage-cutting with an attendant demoralization of market prices and a proportionate increase in the relative weight of fixed charges; (3) an increase in wage rates would, it was alleged, increase the total quantity of effective purchasing power, and hence increase the demand for mass production goods and services." See Douglas and Hackman, The Fair Labor Standards Act of 1938 I (1938) 53 Pol. Sci.Quar. 491. It is, of course, not the Court's function to approve or disapprove the economic wisdom of Congressional findings. See Norman v. Baltimore & Ohio R. R. Co., 294 U.S. 240, 245, 55 S.

Ct. 407, 79 L.Ed. 885, 95 A.L.R. 1352, where Congressional findings of an economic nature were accepted by the Supreme Court.

[6] H.R.Rep. No. 1452, 75th Cong., 1st Sess. (1937) 5. See Sen.Rep. 884, 75th. Cong., 1st. Sess. (1937) 1.

[7] H.Doc. 255, 75th. Cong., 1st Sess. (1937) 4.

[8] On admissibility and the relative weight to be assigned to committee reports, hearings, debates, etc., see Jones, Statutory Doubts and Legislative Intent (1940) 40 Colum.L.Rev. 957; Jones, Extrinsic Aids in the Federal Courts (1940) 25 Iowa L.Rev. 737; Jones, The Plain Meaning Rule and Extrinsic Aids in the Interpretation of Federal Statutes (1939) 25 Wash.U.L.Q. 2.

[9] See 81 Cong.Rec. 7652, 7793 (1937); Sen.Rep. No. 884, 75th. Cong., 1st. Sess. (1937) 1, 3, 4; H.R.Rep. No. 1452, 75th. Cong., 1st. Sess. (1937) 9. See also Douglas and Hackman, The Fair Labor Standards Act of 1938 I (1938) 53 Pol. Sci.Quar. 491.

[10] H.R.Rep. No. 1452, 75th. Cong., 1st. Sess. (1937) 9, 14. See Cooper, The Coverage of the Fair Labor Standards Act and Other Problems in its Interpretation (1939) 6 Law & Contemp. Problems 350,

Mills, D.C., 39 F.Supp. 849, 852, the court said: "The evil was not so much in the length of time men worked, but with nine, ten or twelve million unemployed in this country, the problem was to cut into that unemployment without financially hurting industry or its employees. It was hoped to cut at least four or five million from the unemployment ranks. This it appears was the big objective of the Wages and Hour and Fair Labor Standards Act."

That the overtime provisions of the Act are aimed at re-employment and designed for economic and social purposes, as well as to protect the health or welfare of the employees, seems obvious from the omission of any absolute limitation upon weekly hours of work if properly compensated, and the absence of any limitation upon daily hours.[11]

Not only may an employee be worked twenty-four hours per day; but one hundred and twenty-four hours of overtime per week would not violate the law so long as the employee was paid for all such overtime at the required rate. The Act is not, as the company contends, merely a wage statute. Sunshine Mining Co. v. Carver, D.C.Idaho, 41 F.Supp. 60. Of course the argument for shorter hours is partly justified on the grounds of the added satisfaction which the workers would obtain, but one of the primary purposes was to make it possible for more workers to be added to the payroll.[12] One of the impelling forces behind the Act is the effort to promote economic stability through increased purchasing power.[13] These purposes of the Act are accomplished because the overtime provisions of the Act, requiring employers to pay an extra bonus or penalty for such work, distinctly tend to discourage overtime. This is on the theory that the overtime rate established by the Act will be sufficiently expensive to compel employment of new men, and that employers rather than pay overtime will spread employment.[14]

A great majority of the courts have recognized that Section 7(a) of the Act plainly imposes a requirement which tends to discourage long hours of labor and that Congress intended[15] it to have just that effect. Otherwise, employers would be permitted to defeat the overtime provisions of the Act as to all employees save those whose wage was near the minimum level. In St. John v. Brown, D.C., 38 F.Supp. 385, 390, the Court said: "The 'one and one-half times' provision is akin to a penalty, intended to discourage overtime employment and to encourage a greater spread of employment. It must be remembered that Section 206 [6] is a minimum wages Act, and 207 [7] is a maximum hours Act; that they are really two Acts combined in the same bill." In Floyd v. DuBois Soap Co., Ohio App., 38 N.E.2d 919, 921, the Court said: "Work for a greater number of hours is incompatible with that general welfare and must be discouraged by requiring the employer to pay at the higher rate for all time in excess of the maximum." Similarly in Fleming v. Carleton Screw Products Co., D.C., 37 F.Supp. 754,[16] at page 758, the Court said: "[Section 7] does not purport to regulate wages but imposes a penalty on overtime work, regardless of what the rate of pay may be, thus making overtime work more costly to the employer and creating more employment by limiting the hours of labor." See also Williams v. General Mills,

352; Cooper, "Extra Time for Overtime" Now Law (1938) 37 Mich.L.Rev. 28, 31; Note (1939) 52 Harv.L.Rev. 646, 665, 677.

11 See Chart Showing State and Federal Hour Limitation (1938) U. S. Dept. of Labor (test of true hour law is a limitation on both daily and weekly hours of work). See (1939) 2 Wage Hour Rept. 5, for A. F. of L. criticism of absence of daily limitation. Cf. Wilson v. New, 243 U.S. 332, 37 S.Ct. 298, 61 L.Ed. 755, L. R.A.1917E, 938, Ann.Cas.1918A, 1024.

12 See Douglas and Hackman, The Fair Labor Standards Act of 1938: I (1938) 53 Pol.Sci.Quar. 491.

13 See Joint Hearings before the Committee on Education and Labor, U. S. Senate, and the Committee on Labor,

House of Representatives, on S. 2475 and H.R. 7200, 75 Cong., 3rd Sess. (1937) 93, 237, 307, 334, 597, 646, 918, 1079, 1117. See also H.R.Rep. No. 1452, 75th Cong., 1st Sess. (1937) 9. See Herman, The Administration and Enforcement of the Fair Labor Standards Act (1939) 6 Law & Contemp. Problems 372.

14 See Cooper, "Extra Time for Overtime" Now Law (1938) 37 Mich.L.Rev. 28, 31.

15 For a good discussion of "Congressional intent" see Radin, Statutory Interpretation (1930) 43 Harv.L.Rev. 863; Landis, A Note on Statutory Interpretation (1930) 43 Harv.L.Rev. 886.

16 Now on appeal to the Circuit Court of Appeals for the Eighth Circuit.

D.C., 39 F.Supp. 849, 851; Sunshine Mining Co. v. Carver, D.C.Idaho, 41 F.Supp. 60; Drake v. Hirsch, D.C., 40 F.Supp. 290; Fleming v. Pearson Hardwood Flooring Co., D.C., 39 F.Supp. 300; Abroe v. Lindsay Bros. Co., Minn., 300 N.W. 457; Haddad v. Beckerman Shoe Corp., 4 Wage Hour Rept. 329 (C. P. Berks Co., Pa.); Angel v. Dayton Veneer & Lumber Mills, 4 Wage Hour Rept. 471 (M.D.Ga.); Wilkerson v. Swift & Co., 4 Wage Hour Rept. 305 (N.D.Tex.);[17] Thornberg v. Eastern T. & W. N. C. Motor Transportation Co., Tenn., 157 S.W.2d 823; Wagner v. Estate of Abe Field, 4 Wage Hour Rept. 329 (Super. Ct.Ind., Allen Co.); McMillan v. Wilson & Co., 4 Wage Hour Rept. 409 (D. Minn., Ramsey Co.);[18] Hargrave v. Mid-Continent Petroleum Corp. (D.C.D.Okla.), 42 F.Supp. 908; Boylan v. Linden Mfg. Co., 4 Wage Hour Rept. 158 (C.C.Mich., Ingham Co.); McLenden v. Bewley Mills, 4 Wage Hour Rept. 30 (N.D.Tex.); Graves v. Armstrong Creamery Co., 154 Kan. 365, 118 P. 2d 613.

Furthermore, we think it is not without significance that the Supreme Court of the United States in sustaining the constitutionality of Section 7(a) in United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 462, 85 L.Ed. 609, 132 A.L.R. 1430, relied heavily on prior cases dealing with maximum hour statutes. The Supreme Court in the Darby case said: "Nor is it any longer open to question that it is within the legislative power to fix maximum hours. Holden v. Hardy, 169 U.S. 366, 18 S.Ct. 383, 42 L.Ed. 780; Muller v. Oregon, 208 U.S. 412, 28 S.Ct. 324, 52 L.Ed. 551, 13 Ann.Cas. 957." That Section 7(a) was designed to regulate hours of work is not only implicit in the Darby opinion, but by its separate discussion of Sections 6 and 7 and its reliance upon prior maximum hour decisions, the Supreme Court seems already to have given its imprimatur to the "maximum hour" interpretation which we here adopt.[19]

Certain it is that the Wage and Hour Division considers Section 7(a) was directly aimed at a regulation of hours. As stated by Administrator Elmer F. Andrews in picturesque language, the primary purposes of the Act are to fix a floor for wages, a ceiling for hours, and a break for children.[20] The interpretation urged upon the Wage and Hour Division was that the overtime provisions of the Act applied only to employees paid the basic minimum wage rate and that the Act essentially was only a "poor man's" minimum wage law.[21] This interpretation was rejected, and the official interpretation is that the overtime provisions of the Act extend to all employees whatever may be the wage paid.[22] A similar interpretation was urged upon this Court, and we reject it too. Since the overtime provisions of the Act were designed to spread employment opportunities by making overtime more costly, it is obvious that this purpose cannot be achieved if the overtime provisions are to be restricted to those workers at the minimum wage level. A vast majority of the courts have recognized in consequence that the Act does apply to employers paying in

[17] Now on appeal to the Circuit Court of Appeals for the Fifth Circuit. 124 F.2d 176.

[18] Now on appeal to the Supreme Court of Minnesota.

[19] Subsequently, in Olsen v. Nebraska, 313 U.S. 236, at page 245, 61 S.Ct. 862 at page 864, 85 L.Ed. 1305, 133 A.L.R. 1500, the Supreme Court said: "And at this term we upheld the minimum wage and maximum hour provisions of the Fair Labor Standards Act of 1938 * * *. United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 [132 A.L.R. 1430]."

[20] See 3 Fed.Bar Ass.Jour. 333. It is likewise indisputable that the popular designation of the Fair Labor Standards Act has always been that of a Wages and Hours Act.

[21] Of the thirty-six and a half million workers gainfully employed in the United States it has been estimated that eleven million fall within the protection of the Act. See Interim Report of the Wage and Hour Division—Aug. 15th. to Dec. 31st, 1938, U.S.Dept. of Labor, I—10B. The Report at page 10 gives the following statistics on the economic coverage of the Act and number of employees affected:

No. of employees covered by the Act—11,000,000

No. of employees receiving less than 25¢ per hour—300,000

No. of employees receiving less than 30¢ per hour—350,000

No. of employees receiving less than 40¢ per hour—1,418,000

No. of employees working more than 44 hours weekly—1,384,000

No. of employees working more than 42 hours weekly—1,751,000

No. of employees working more than 40 hours weekly—2,184,000

[22] Interpretative Bulletin No. 4, 1940 Wage & Hour Man. 95.

excess of the minimum wages prescribed in the Act. E. g., Fleming v. Carleton Screw Products Co., D.C., 37 F.Supp. 754; St. John v. Brown, D.C., 38 F.Supp. 385; Allen v. Moe, D.C., 39 F.Supp. 5; Drake v. Hirsch, D.C., 40 F.Supp. 290; Sunshine Mining Co. v. Carver, D.C.Idaho, 41 F.Supp. 60; Floyd v. DuBois Soap Co., Ohio App., 38 N.E.2d 919, affirming Floyd v. DuBois Soap Co., Com.Pl. Hamilton Co., 6 Ohio Supp. 76; Thornberg v. Eastern T. & W. N. C. Motor Transportation Co., Tenn., 157 S.W.2d 823.

We are not unmindful of the fact that several courts have rejected the "maximum hour" interpretation of Section 7(a) which we here adopt and are wedded to a "minimum wage" theory of that Section. See Fleming v. A. H. Belo Corp., 5 Cir., 1941, 121 F.2d 207, certiorari granted, 62 S.Ct. 137, 86 L.Ed. ——; A. H. Belo Corp. v. Street, D.C., 36 F.Supp. 907; Reeves v. Howard County Refining Co., D.C., 33 F. Supp. 90; Bumpus v. Continental Baking Co., No. 211, W.D.Tenn., April 29, 1941,[23] Fleming v. Atlantic Co., D.C., 40 F.Supp. 654; Fleming v. Stone, D.C.N.D.Ill., 41 F.Supp. 1000; Gurtov v. Volk, Mun.Ct. N.Y.1939, 170 Misc. 322, 11 N.Y.S.2d 604. In the Belo case, the Court said at pages 211 and 212 of 121 F.2d: "Section 7, the section in question, does not at all fix maximum hours. * * * The purpose of the act is to establish and gradually raise minimum wages, that *the overtime provisions in it are inserted not at all to discourage or limit overtime but as a part of the scheme to raise substandard wages. * * *.*" (Italics ours.) We are unable to agree with the Circuit Court of Appeals for the Fifth Circuit that the overtime provisions of the Act are merely part of a scheme to raise substandard wages. Rather we conclude that the purpose of Section 7(a) is to eliminate long hours of labor by requiring employers to pay extra compensation for overtime work. Otherwise the guarantees of the Act become "only a promise to the ear to be broken to the hope, a teasing illusion like a munificent bequest in a pauper's will."[24]

### Meaning of "Regular Rate" as Used in Section 7(a).

As we have already indicated, the court below adopted a "minimum wage" theory of Section 7(a) and consequently concluded that the overtime provisions of the Act are satisfied by the payment of one and one-half time the statutory minimum rate for each overtime hour—"regular rate" and "minimum rate" becoming synonymous. This interpretation makes the overtime provisions of the Act effective only as to employees in the lowest wage brackets. Since we have adopted a "maximum hour" interpretation of Section 7(a), it follows as the night the day that we must reach a different conclusion. We think it is clear that "regular rate" of pay means the *actual* rate of pay which the employee is receiving no matter how high, and not the minimum rate set forth in the statute.[25] "In no other way could the coercive effect of the provision for one and one-half times the regular rate for overtime be brought into operation as clearly intended by Congress." Floyd v. DuBois Soap Co., Ohio App., 38 N.E.2d 919.

Congress must have had in mind the fact that many employees who were within the policy of the Act would receive wages in excess of the minimum and hence it is difficult to see how the objective of discouraging excessive overtime can be accomplished if "regular rate" is to be construed as meaning "minimum rate". Such a construction would wholly defeat this policy, for if an employee was getting a fairly high wage, one and one-half times the minimum would in such a case be less than the actual wage the employee was receiving per week in the normal course of his employment. This would encourage rather than discourage overtime, and the plain purpose of Congress—viz. to deter employers from working their employees overtime—would be frustrated. Such a mischievous fallacy we cannot permit. As was said by the Court in Fleming v. Carleton Screw Products Co., D.C., 37 F.Supp. 754, at page 757: "It seems * * * that the construction contended for by de-

---

[23] Reversed by the Circuit Court of Appeals for the Sixth Circuit, Dec. 10, 1941. 124 F.2d 549.

[24] Quoted from Mr. Justice Jackson in Edwards v. California, 1941, 62 S.Ct. 164, 172, 86 L.Ed. ——.

[25] Thus, an employer paying $24 for a 48-hour week is not complying with the statute simply because the employees receive the equivalent of 25 cents an hour and 37-½ cents for each hour in excess of 44. The employees must be paid 50 cents for the first 44 hours and 75 cents for the last four, a total of $25.

fendant to the effect that employer and employee may agree on a regular rate of pay regardless of what compensation the employee actually receives, will permit employers to avoid the obligations imposed by Section 7 and will completely nullify the overtime provisions therein contained." It seems clear that the benefits of the Act were intended to apply to a wider group than those employed at the statutory minimum and therefore the Act ought not to be construed to exclude them from its principal benefits.

██ Numerous other factors seem to support the conclusion which we have here reached. First, the words of Section 7(a) —to-wit: *"regular rate at which he is employed"*—tend to indicate that it is the actual wage of the particular employee involved rather than the general minimum; otherwise the underscored words would be superfluous if not meaningless. We do not believe the words can be interpreted to mean the minimum required by the Act because the plain language, we think, is not subject to that interpretation when read in its ordinary meaning. Normally the best evidence of congressional purpose is the language of the law itself.[26] In Haddad v. Bedkerman Shoe Corp., 4 Wage Hour Rept. 329: (C. P. Berks Co., Pa.), the Court said: "Nor can it successfully be maintained that by regular rate is intended 'minimum rate'. If Congress had intended the overtime to be paid at one and one-half times the 'minimum' legal rate, it could have said so very aptly by using the word 'minimum' instead of the word 'regular'. The fact that it did not do so is a plain indication that it did not so intend." Similarly, in Thornberg v. Eastern T. & W. N. C. Motor Transporta-

tion Co., Tenn., 157 S.W.2d 823, the Court said: "By the language of the statute, therefore, the one and one-half pay for overtime is one and one-half times the rate at which the particular employee is employed, whatever that may be."

Secondly, Section 18 of the Act, 52 Stat. 1069 (1938), 29 U.S.C.A. § 218, reinforces the opinions just expressed as to what Congress intended by the words "regular rate" of pay as used in Section 7(a). Section 18 of the Act provides that: "No provision of this Act [sections 201–219 of this title] shall justify any employer in reducing a *wage paid by him* which is in excess of the applicable minimum wage under this Act [sections 201–219 of this title] * * *." (Italics supplied.)

 By enacting Section 18, Congress intended primarily to discourage the possible tendency that the minimum wage fixed in the Act would become the maximum wage paid by employers. In declaring that no provision of the Act shall justify a reduction of wages, one of the aims of the Act is to prevent lowering of existing rates when they exceed the minimum. Thus, if overtime is to be computed at the minimum rate instead of the "wage paid by him", this obviously tends to reduce the existing wage within the meaning of this Section. If the rate is variable at the whim of the employer, the hour provisions of the Act have no effective sanctions. Section 7(a) and Section 18 must be read together, and a comparison of these two sections points to the conclusion which we have reached.

██ Thirdly, both the interpretative bulletins[27] issued by the Wage and Hour Division and regulations[28] have interpreted

---

[26] "There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." United States v. American Trucking Ass'n, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345.

[27] "The Act is clear that it is the employee's regular rate of pay on which time and one-half is based and not any minimum wage set in the Act." See Interpretative Bulletin No. 4, 1940 Wage & Hour Man. 95, 96. In answering questions at a meeting of the Southern States Industrial Council on Sept. 29, 1938, in Birmingham, Ala., Administrator Andrews first stated that a worker employed on a flat weekly salary might be worked

more than 44 hours a week, without increased pay, provided his total earnings were not below the minimum requirements of the law. See 3 Wage Hour Rept. 228. This impromptu remark was quickly retracted and subsequent statements and bulletins from the Administrator are all to the opposite effect. See, e. g., Interpretative Bulletin No. 4 issued on Oct. 21, 1938, before the Act became effective. The subject is discussed in an editorial in the New York Times of Tuesday, October 25, 1938.

[28] Regulations on Records § 516.4, 1940 Wage & Hour Man. 282. The regulation was cited with approval and followed in Emerson v. Mary Lincoln Candies, Inc., Sup.Ct., 174 Misc. 353, 20 N.Y.S.2d 570.

"regular rate at which he is employed" to mean the actual rate the employee is receiving and not the statutory minimum. Although such interpretations are by no means binding on the courts, we consider them highly significant. See United States v. American Trucking Ass'n, 310 U.S. 534, 549, 60 S.Ct. 1059, 1067, 84 L.Ed. 1345;[29] Jacobs v. Peavy-Wilson Lumber Co., D.C., 33 F.Supp. 206, 212; Haddad v. Bedkerman Shoe Corp., 4 Wage Hour Rept. 329 (C. P. Berks Co., Pa.); Wood v. Central Sand & Gravel Co., D.C., 33 F.Supp. 40.

Fourthly, the vast majority of the courts have construed "regular rate" of pay to mean the actual pay which the employee is receiving, expressly denying that "regular rate" is synonymous with "minimum rate". Fleming v. Carleton Screw Products Co., D.C., 37 F.Supp. 754; Fleming v. Pearson Hardwood Flooring Co., D.C., 39 F.Supp. 300; Williams v. General Mills, D.C., 39 F. Supp. 849; Sunshine Mining Co. v. Carver, D.C., Idaho, 41 F.Supp. 60; St. John v. Brown, D.C., 38 F.Supp. 385; Drake v. Hirsch, D.C., 40 F.Supp. 290; Haddad v. Bedkerman Shoe Corp., 4 Wage Hour Rept. 329 (C. P. Berks Co., Pa.); Wilkenson v. Swift & Co., 4 Wage Hour Rept. 305 (N.D.Tex.); McLendon v. Bewley Mills, 4 Wage Hour Rept. 30 (N.D.Tex.); Floyd v. DuBois Soap Co., 4 Wage Hour Rept. 541, Ohio App., 38 N.E.2d 919, affirming Floyd v. DuBois Soap Co., Com.Pl. Hamilton Co., 6 Ohio Supp. 76; Thornberg v. Eastern T. & W. N. C. Motor Transportation Co., Tenn., 157 S.W.2d 823; Angel v. Dayton Veneer & Lumber Mills, 4 Wage Hour Rept. 471 (N.D.Ga.); Muldowney v. Seaberg Elevator Co., D. C., 39 F.Supp. 275; McMillan v. Wilson & Co., 4 Wage Hour Rept. 409 (D.Minn. Ramsey Co.); Moss v. Postal Telegraph Cable Co., 4 Wage Hour Rept. 221 (D.C. M.D.Ga.) 42 F.Supp. 807; Boylan v. Linden Mfg. Co., 4 Wage Hour Rept. 158 (C.C. Mich.Ingham Co.); Graves v. Armstrong Creamery Co., 154 Kan. 365, 118 P.2d 613. In St. John v. Brown, D.C., 38 F.Supp. 385, at page 389, the Court said: "The key to the right answer is the true per hour wage of the employee. That must be determined, of course, by reference to the actual employment contract. That amount, whatever it is, represents the true regular rate of pay for each of the hours worked in a week." The Court also made this significant statement at page 389 of 38 F.Supp: "It is not enough that the salaries here, independent of the working contract, may be allocated or spread so as to cover the minimum and one and a half for overtime. It may even exceed the 30¢ minimum and the 45¢ for overtime and yet be a violation of the law."

As we have indicated, those courts which adopt a "minimum wage" theory of Section 7(a) almost inevitably must reach a conclusion different from the conclusion that we have here reached. See Fleming v. A. H. Belo Corp., 5 Cir. 1941, 121 F.2d 207, certiorari granted, 62 S.Ct. 137, 86 L. Ed. ——; Reeves v. Howard County Refining Co., D.C., 33 F.Supp. 90; Bumpus v. Continental Baking Co., No. 211, W.D. Tenn., April 29, 1941, supra; Gurtov v. Volk, Mun.Ct.N.Y.1939, 170 Misc. 322, 11 N.Y.S.2d 604. Yet surprisingly enough, the Court in the Belo case, supra, used language which would indicate that the position we have taken is unassailable: "In cases where there is no express agreement as to the regular rate at which the employee is employed, but only an agreement for a weekly wage, appellant's method of arriving at the regular rate by assuming that the wage stipulated for is not intended to cover overtime worked, would, we think, be unexceptional." Fleming v. A. H. Belo Corp., 5 Cir., 121 F.2d 207, 211.

To be sure, the facts in the Belo case are distinguishable from the case at bar. In that case, the plan of the Dallas News was to make individual contracts with its reporters guaranteeing them a weekly salary above the statutory minimum. The contract called for a "basic hourly rate" exceeding the minimum wage prescribed by the Act, with overtime at the rate of one and one-half times this "basic hourly rate",

See, also, Haddad v. Bedkerman Shoe Corp., 4 Wage Hour Rept. 329 (C. P. Berks Co., Pa.). In an address by the former General Counsel of the Wage and Hour Division, no mention was made of any possible ambiguity in "regular rate". See Magruder, Administrative Procedure under the Fair Labor Standards Act, 25 A.B.A.J. 688 (1939).

[29] In this case, the Supreme Court said that the Administrator's interpretation was entitled to great weight since it was a "contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new."

and guaranteed to each employee a predetermined weekly wage. Thus, the formula called for one hourly rate up to forty hours and a higher rate beyond that; but provided that the employees got the full amount whether or not they worked more than forty hours in any week. Salaries were not reduced, but neither was extra pay given for overtime. The Wage-Hour Division contended that overtime should be calculated on the actual weekly wage. The Court rejected this contention and upheld the wage-payment plan. The case differs from the case at bar because there was a contract for a weekly wage, and also for an hourly "regular rate" not less than the minimum on which overtime should be computed. We find no such written contract in the instant case, and there is no evidence in the record, nor any contention by the defendant, that the parties had agreed upon a rate of pay per hour. That there are important grounds of distinction is admitted by the Court in the Belo case in the very language we have quoted. Furthermore, that same Court in a very recent decision, Warren-Bradshaw Drilling Co. v. Hall, 5 Cir., 124 F.2d 42 decided Dec. 9, 1941, expressly stated that the written agreement in the Belo case was determinative of the issue.

## Method of Computation.

■ Although the Act only establishes hourly wage standards, it has been uniformly interpreted as covering salaried workers as well as employees paid on an hourly basis. E. g., St. John v. Brown, D. C., 38 F.Supp. 385; Fleming v. Pearson Hardwood Flooring Co., D.C., 39 F.Supp. 300; In re New Style Hat Mfg. Co., Bankrupt, (D.C.N.D.Ohio) 43 F.Supp. 122; Moss v. Postal Telegraph-Cable Co., (D. C.M.D.Ga.) 42 F.Supp. 807; Boylan v. Linden Mfg. Co., 4 Wage Hour Rept. 158 (C.C.Mich); Williams v. General Mills, D.C.N.D.Ohio, 39 F.Supp. 849; Hargrave v. Mid-Continent Petroleum Corp. (D.C. E.D.Okl.) 42 F.Supp. 908; Haddad v. Beckerman Shoe Corp., 4 Wage Hour Rept. 329 (C. P. Berks Co., Pa.). Otherwise the Act would be almost completely ineffective in reducing the actual hours worked per person, since the penalty for overtime would be purely nominal and in no sense real. In Boylan v. Linden Mfg. Co., supra, the Court stated this expressly (at page 158): "That the statute was intended by Congress to apply to employees receiving weekly or monthly wages is, I think, reasonably apparent from a consideration of all the provisions of the Act. * * * There would seem to be no satisfactory basis for limiting the scope of the statute to employees working solely on the basis of a specific hourly wage."

■ Similarly, the mere fact that a worker's hours of employment fluctuate does not insulate him from the protection of the overtime provisions of the Act. E. g., St. John v. Brown, D.C., 38 F.Supp. 385; Abadie v. Cudahy Packing Co., D.C., 37 F.Supp. 164; McMillan v. Wilson & Co., 4 Wage Hour Rept. 409 (D.Minn.Ramsey Co.); Hargrave v. Mid-Continent Petroleum Corp., D.C.E.D.Okla., 36 F.Supp. 233; Boylan v. Linden Mfg. Co., 4 Wage Hour Rept. 158 (C.C.Mich.). In Boylan v. Linden Mfg. Co., the Court said (at p. 159): "The record indicates that plaintiff worked a fluctuating number of hours per week during the period of his employment. *This means that the average hourly rate must be computed separately for each week* by dividing the sum of fifty dollars by the number of hours actually worked." (Italics supplied.)

■ In this connection it should be noticed that the word "regular" as used in the overtime compensation provisions of the Act referring to the employee's "regular rate" of pay does not necessarily mean unvarying. In Haddad v. Bedkerman Shoe Corp., 4 Wage Hour Rept. 329 (C. P. Berks Co., Pa.) for example, it was argued that a person paid by the week has no "regular" hourly rate; that if in some weeks he works more than in others, his hourly rate would differ each week. This argument was summarily rejected and the Court said (at p. 329): "We do not think the word 'regular' must necessarily and in all cases mean 'unvarying'. 'Regular' means, in the first place, in accordance with a *regula* or rule. It does not necessarily imply an unvarying sameness. It may mean normal, agreeable to established, customary forms * * *. We think a fair interpretation of the word as used is that it means basic or actual hourly pay. * * *"

■ If the employee's hours vary from week to week, the cost per week to his employer will vary accordingly. See Wilson v. New, 243 U.S. 332, 361, 362, 37 S.Ct. 298, 61 L.Ed. 755, L.R.A.1917E, 938, Ann.Cas.

1918A, 1024. There is nothing in the Act which prevents the average hourly rate from being computed separately each week. In fact, the Act contemplates *workweek* as the regular unit for computing the hourly rate.

■■■ The Wage and Hour Division has construed "regular rate" of pay to mean the actual hourly rate of pay, computed by dividing the actual weekly wage by the number of hours actually worked. Regulations on Records § 516.4, 1940 Wage & Hour Man. 282; Interpretative Bulletin No. 4, 1940 Wage & Hour Man. 95, 96.[30] Where the employee works an irregular or fluctuating number of hours from week to week, his regular rate of pay is to be computed each week by dividing his weekly salary by the number of hours he worked that week. See Interpretative Bulletin No. 4, 1940 Wage & Hour Man. 95, 97. Similarly, a vast majority of the courts agree that the regular rate is to be computed on the basis of wages actually received each week divided by the number of hours worked each week.[31] St. John v. Brown, D.C., 38 F.Supp. 385; Floyd v. DuBois Soap Co., Ohio App.1941, 38 N.E.2d 919; McLendon v. Bewley Mills, 4 Wage Hour Rept. 30 (N. D.Tex.); Muldowney v. Seaberg Elevator Co., D.C.E.D.N.Y., 39 F.Supp. 275; Sunshine Mining Co. v. Carver, D.C.Idaho, 41 F.Supp. 60; McMillan v. Wilson & Co., 4 Wage Hour Rept. 409 (D.Minn.Ramsey Co.); Haddad v. Bedkerman Shoe Corp., 4 Wage Hour Rept. 329 (C. P. Berks Co.); Moss v. Postal-Telegraph-Cable Co. (D.C. M.D.Ga.) 42 F.Supp. 807; Emerson v. Mary Lincoln Candies, Inc., Sup.Ct., 174 Misc. 353, 20 N.Y.S.2d 570; Angel v. Dayton Veneer & Lumber Mills, 4 Wage Hour Rept. 471 (N.D.Ga.); Boylan v. Linden Mfg. Co., 4 Wage Hour Rept. 158 (C.C. Mich., Ingham Co.); Graves v. Armstrong Creamery Co., 154 Kan. 365, 118 P.2d 613. In Hargrave v. Mid-Continent Petroleum Corp. (D.C.E.D.Okl.), 42 F.Supp. 908, 909, the Court said:

"* * * their regular wage is to be computed upon the basis of the wages actually received each week divided by the number of hours worked each week. For that number of hours in excess of the maximum, plaintiffs are entitled to be compensated at the rate of one and a half times the regular rate.

"The plaintiffs have not received compensation for overtime at one and a half times their regular rate, but have been paid only at regular rates of pay for all hours they worked during the weeks in question, and each plaintiff is therefore entitled to an additional one-half of his regular rate for each hour of overtime in each of the weeks in question."

In an effort further to clarify the point, we present one example. Let us suppose an employee is employed at a salary of $30 for a workweek of indefinite length. For a week of 50 hours his regular rate of pay would be 60 cent per hour ($30÷50). The employee's total earnings for the week would be $33, computed as follows:

| | |
|---|---|
| 40 hours at 60 cents per hour (straight time) | $24.00 |
| 10 hours at 90 cents per hour (time and one-half) | $ 9.00 |
| | $33.00 |

The following week, his total earnings would be similarly computed and so on each week.

### The Liquidated Damages Provision of the Act.

One last point remains for our determination, and that involves the interpretation of Section 16(b) of the Act, 52 Stat. 1069 (1938), 29 U.S.C.A. § 216(b) Section 16(b) provides: "Any employer who violates the provisions of section 6 [206] or section 7 [207] of this Act [title] shall be liable * * * in the amount of * * * unpaid overtime compensation * * * and in an additional equal amount as liquidated damages."

■■■ Is this provision of the law as to liquidated damages mandatory or discretionary? Since the Act has been violated in good faith in this case, we would indeed

---

30 Similarly, piece work must be translated into hourly rates. See Wagner v. Estate of Abe Field, 4 Wage Hour Rept. 329 (Super.Ct.Ind.)

31 Thus, an employee receiving $40 for a 50 hour week would be deemed to be paid at the rate of 80 cents an hour, and the courts require that his weekly wage be increased to $42.40 ($.80 x 44 plus $1.20 x 6).

like to hold that it is discretionary. It seems a keen injustice for employers bewildered by strange legislation and confused by divergent authority in the courts to be subjected to such a measure. Yet no matter how much we lament its harshness, the Section appears to be mandatory and virtually all the courts have so construed it. St. John v. Brown, D.C., 38 F.Supp. 385; Williams v. General Mills, D.C., 39 F.Supp. 849; Muldowney v. Seaberg Elevator Co., D.C., 39 F.Supp. 275; Thompson v. Daugherty, D.C., 40 F.Supp. 279; Emerson v. Mary Lincoln Candies, Inc., Sup.Ct., 174 Misc. 353, 20 N.Y.S.2d 570; Reeves v. Howard County Refining Co., D.C., 33 F. Supp. 90; Magann v. Long's Baggage Transfer Co., D.C., 39 F.Supp. 742; Lefevers v. General Export Iron & Metal Co., D.C., 36 F.Supp. 838; Hargrave v. Mid-Continent Petroleum Corp. (D.C.E.D.Okl.) 42 F.Supp. 908; Moss v. Postal Telegraph Co. (D.C.M.D.Ga.) 42 F.Supp. 807; McMillan v. Wilson & Co., 4 Wage Hour Rept. 409 (D.Minn.Ramsey Co.); Wagner v. Eastate of Abe Field, 4 Wage Hour Rept. 392 (Sup.Ct.Ind.); Roberts v. Hoarel, 4 Labor Cases 60648; Abroe v. Lindsay Bros. Co., Minn., 300 N.W. 457.

The use of the word "wilful" in Section 16(a) defining criminal liability under the Act and its omission in Section 16(b) defining civil liability would seem to indicate that the employer's good faith is immaterial under Section 16(b). The only case we have been able to find which refused to apply Section 16(b) in the case of a good faith violation of the Act is Clour v. Jones, (D.C.E.D.Okl.) 42 F.Supp. 700. While we are extremely sympathetic with the sentiments which prompted the Court to recoil from a mandatory application of the Section in that case, we are unable to agree with the result. Such matters are for Congress and not for the courts. The views we have expressed throughout this opinion are in accord with those expressed by the Circuit Court of Appeals for the Sixth Circuit in the very recent decision of Bumpus v. Continental Baking Co., 124 F.2d 549, decided Dec. 10, 1941.

For the reasons set forth above, the decision of the lower court is reversed and the case remanded with directions to enter judgment for the plaintiff in accordance with this opinion..

Reversed and remanded.