## DRAKE v. HIRSCH.

### No. 2231.

District Court, N. D. Georgia, Atlanta Division.

Aug. 8, 1941.

A. L. Henson, Samuel H. Wilds, and Sidney T. Schell, all of Atlanta, Ga., for plaintiff and intervenors.

Albert E. Mayer, of Atlanta, Ga., for defendant.

UNDERWOOD, District Judge.

The above case came on regularly for final hearing and was tried to the Court without a jury.

Petitioner sues, under the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., to recover alleged unpaid minimum wages and overtime compensation and for an additional equal amount as liquidated damages, and for reasonable attorney's fees.

Interventions were filed by Charles E. Kirby and his wife, Mrs. Rosalind S. Kirby, in which they seek to recover alleged unpaid overtime compensation, amounting in the case of Mr. Kirby to $103.46, and in the case of Mrs. Kirby, $134.46, both claiming additional amounts equal to said respective sums sued for, and also for reasonable attorney's fees.

A cross-claim, amounting to $148.41, was filed by defendant against Mr. Kirby, which was not denied and no defense made thereto.

### Findings of Fact.

Plaintiff was employed by defendant as a truck driver from June 12, 1939, to November 18, 1939, at a salary of $14 per week, payment of which he received every week during said period. He worked from 7 A. M., to 6 P. M., with one hour out for lunch, six days a week. This was at the rate of 23⅓ cents per hour. He claims that he sometimes worked longer hours than these, but as to the number of such extra hours he did not "have any idea of knowing because he didn't punch a time clock," and there was "no way of keeping up with it."

He claims to have worked as a striker for his brother-in-law on defendant's truck from May 8, 1939, to June 12, 1939, but he was not an employee of defendant during this period and there is no evidence to show the number of hours he worked at such job or the character of the goods delivered.

From June 12, 1939, to October 24, 1939, the permissible hours under the Fair Labor Standards Act were forty-four (44) hours per week and plaintiff's overtime amounted to sixteen (16) hours per week, or a total of 306⅔ hours during that period. From October 24, 1939, to November 18, 1939, the permissible hours were forty-two (42) per week so that plaintiff's overtime during that period amounted to eighteen (18) hours per week, or a total of 69 hours. Therefore, if the Act is applicable to him, he should be credited with $43.45 for unpaid overtime compensation at the rate of 37½¢ per hour for the first period, and $14.95 for unpaid overtime compensation at the rate of 45¢ per hour for the second period, making a total of $58.40; and in addition, $13.94 for un-

paid minimum wages for the first period, and $10.73 for the second period, or a total of $24.67 for unpaid minimum wages. This makes a total of $83.07 for all unpaid minimum wages and unpaid overtime compensation.

Plaintiff was employed as a truck driver and his duties were to make deliveries of merchandise to local customers of defendant. No deliveries out of the State of Georgia were made by him, but he claims that he made certain deliveries of goods to local customers who were supposed to have thereafter transported them in interstate commerce. There is no direct evidence, oral or documentary that any were so transported, but there was testimony, circumstantial in character, of alleged delivery of goods which did not have Georgia revenue stamps affixed. Such goods were assumed by plaintiff to be for interstate shipment because the goods did not have Georgia revenue stamps affixed. However, the State did not require revenue stamps if the goods were to be sold without the State, or if the purchasers of said goods, who sold them within the State, had permission from the State to receive the unstamped goods and stamp them themselves. Deliveries of unstamped goods were made to Lane Drug Company in Atlanta which did not bear Georgia revenue stamps. The evidence showed, however, that this was proper since Lane Drug Company was authorized to receive them unstamped and to stamp them. There is no evidence which establishes that these goods moved, or were intended to be moved by Lane Drug Company in interstate commerce. Similar unstamped goods were delivered in Atlanta to the Atlanta Athletic Club, which plaintiff supposed would be transported by it to its branch club in Highlands, North Carolina. The delivery of unstamped goods to the Club was authorized by the State. Four or five unstamped packages were also alleged to have been addressed to the dining car superintendent of the Southern Railway and delivered to its freight depot, but there was no evidence to show what became of them or where they were used. In addition, plaintiff testified that certain packages were mailed out by him by parcel post to points outside the State of Georgia, that he inferred this because the mail clerk would separate the packages into piles, one for local and the other for out of State mail, but that he did not notice the addresses and "never had occasion to examine the packages close enough to familiarize myself with it," but that he did remember two instances, one where a package was sent to some place in Kentucky, and another to Hollywood, California. He did not identify the contents of any of the packages. Sam Hirsch testified defendant did no business in Hollywood and had no customers outside the State of Georgia, and also that persons connected with the business often sent parcel post packages of their own with defendant's shipping label on them but which had no connection with defendant's business.

I find that the evidence is insufficient to prove that the above mentioned deliveries formed a part of interstate commerce.

These were all the transactions that could approximate kinship with interstate commerce, except certain deliveries known as drop shipments. A drop shipment, according to the testimony, is an order that is taken by a factory salesman carrying a certain amount of free goods for the purchaser. It consists of a number of items and the goods are shipped to the jobber, who places it in his warehouse in the usual way and several days later delivers it to the retailer upon the latter's order and gives him the purchased goods and also the free goods called for in the order. If the goods are such as are required to be stamped, the packages are broken and stamps affixed, but if not, the packages are delivered unbroken. Such shipments averaged two or three a week and constituted a very small part of defendant's business.

Intervenor, Mr. Kirby, who did not appear and did not testify in the case, was an accounts receivable bookkeeper and was employed by defendant from October 1, 1938, until December 15, 1939. His rate of pay was $18.50 a week and he received this amount each week during said period, including the time he was off on vacation and also ten (10) days he was absent because of an automobile accident. His duties during said period of employment consisted exclusively of keeping records of accounts receivable of local customers of defendant, that is, invoices representing goods sold to local customers, and posting them on the ledger. The only work he did was in connection with these accounts receivable showing sales to local customers, and had nothing to do with the records of purchases and receipts of goods shipped to defendant from out of the State. These latter records were kept entirely separate and by other em-

ployees. I find, on the record in this case, that he was not engaged in interstate commerce.

Intervenor, Mrs. Kirby, was employed by defendant from October 1, 1938, until April 12, 1940, at a salary of $15 per week, which was paid each week during her employment without deduction for absences due to illness or vacation. She worked from 8 A. M., to 6 P. M., with one hour out for lunch, making nine (9) hours a day, six days a week. Her duties consisted of keeping the accounts receivable ledger relating to the Georgia Revenue Tax in which the Georgia Revenue Tax was charged to local but to no other customers, and of making cash salesmen's reports twice a month, stamping cash sales made over the counter and recorded every day, and filing correspondence and documents relating to these transactions. It was not her duty to do anything else but, for mutual accommodation, she sometimes helped others with their work and they helped her, but the evidence does not show what work she did for others. She had nothing to do with the keeping of the books or records of transactions connected with the purchase and receipt by defendant of goods from without the State. These were kept by other employees. I find on this record that she was not engaged in interstate commerce.

Defendant is a wholesaler dealing in cigars, cigarettes, candy, chewing gum, pipes, razor blades, pencils, coca-cola syrup, and extracts and fountain supplies. More than ninety per cent of the merchandise sold by defendant is shipped to defendant from outside the State of Georgia, but all of defendant's customers, who are retailers, are located in Atlanta or an area of twenty to twenty-five miles around Atlanta, except a few in other cities in Georgia who send in orders to be filled by parcel post.

The goods purchased from outside the State of Georgia are brought into defendant's warehouse and distributed in various parts of the building where the respective goods belong. The original packages of cigarettes are broken up and the cigarettes stamped. The great bulk of those sold are stamped, 99% of them or more. The candy is unpacked from the cases and put on the candy shelf; gum is unpacked from their cases and put on the gum shelf; and the cigars are unpacked from cigar cases and some stamped and some put on shelves to be stamped. Aspirin tablets are opened up and put in a room where they are locked up,

and razor blades, pencils, pipes, and small merchandise of value are kept locked in a room. Original packages and merchandise in bulk are opened and distributed to proper places in the warehouse and then fed into the open bins as required by the stockman.

Merchandise, except perhaps drop shipments, was not sold and delivered to customers in their original unbroken packages, nor sold prior to their purchase and receipt by defendant, but sales in varying quantities and character were always made from a stock of goods already on hand, and if not on hand, the orders themselves were cancelled and not recorded for future acquisition and delivery of the goods. There was no continuing stream of goods from purchaser to retailer. The stock remained in the warehouse, usually in broken but sometimes in the original packages, varying lengths of time, some a week, some a month, some six months and some two or three years.

As far as this record shows, all goods purchased by and delivered in interstate commerce to defendant were, when they reached their destination, placed in defendant's warehouse and incorporated in the general stock of merchandise there held for sale, and became subject to taxation and were taxed by the State of Georgia.

### Conclusions of Law.

Section 7(a) of the Fair Labor Standards Act provides that:

"(a) No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce—

"(1) for a workweek longer than forty-four hours during the first year from the effective date of this section,

"(2) for a workweek longer than forty-two hours during the second year from such date, or

"(3) for a workweek longer than forty hours after the expiration of the second year from such date,
unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C.A. § 207(a).

There is no question here either of defendant's or of plaintiff's and intervenors' having been engaged in the "production of goods for commerce," but only whether they were "engaged in commerce."

■ Defendant was engaged in interstate commerce to the extent of the transactions involved in the purchase and receipt of goods from states other than Georgia and all employees engaged in labor, clerical or manual, appropriate and necessary to the furtherance of such transactions, were employees engaged in interstate commerce. United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430.

However, plaintiff and intervenors were not engaged in that part of defendant's business, but, except as to the deliveries by plaintiff of drop shipments, dealt exclusively with the merchandise and the records pertaining thereto only after the merchandise had been received and had come to rest in Georgia as part of defendant's general stock of merchandise and after the original packages had been broken, stamps, where necessary, affixed, and the goods distributed throughout the warehouse.

The merchandise, at least as far as this record shows, was not sold and delivered to customers, as in the case of Fleming, Adm'r, v. Alterman Brothers, D.C., 38 F.Supp. 94, in their original unbroken packages, nor sold prior to their receipt by defendant, but sales were always made from stocks of goods already on hand.

Having no duties connected with the interstate transactions involved in the purchase and receipt of the goods, and only dealing with them and records pertaining thereto after the original packages had been broken and the goods had acquired a situs within the State, plaintiff and intervenors could not be brought under the Fair Labor Standards Act because of said interstate transactions, and could come under the Act only if their activities with respect to the subsequent disposition of the goods constituted engagement in interstate commerce.

■ Of course the duty rests upon plaintiff and intervenors to establish by a preponderance of the evidence that their activities amounted to engagement in interstate commerce. This fact must be established by evidence actually adduced at the trial and each case must stand upon its peculiar facts as proved by legal evidence. I find that the evidence does not establish that intervenors were engaged in interstate commerce nor that plaintiff was so engaged (Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947), unless his activities in delivering drop shipments constituted engagement in interstate commerce. Intervenors,

not having established by the evidence that they were engaged in interstate commerce, can not be afforded rights under the Fair Labor Standards Act and they can not prevail in their interventions.

The same result will follow as to plaintiff, unless the evidence with reference to his handling of the drop shipments brings him within the provisions of the Act. This question will now be considered.

The evidence shows that these drop shipments represented purchases made between customers in Georgia and factories in other states and that the factory filled these orders by shipping the goods ordered, together with free goods which were in the nature of a premium, to defendant for delivery to the factory customers. Upon presentation of orders to defendant by the factory customers, defendant would deliver these shipments, in their original packages, to the customers, after perhaps a short temporary delay during which they were held in defendant's warehouse, which, however, did not change their character as interstate shipments. State of Texas v. Anderson, Clayton & Co., 5 Cir., 92 F.2d 104, 107, and cases therein cited.

While these interstate shipments were not in large volume and constituted only a small part of defendant's business, nevertheless, they were substantial in amount, and were not isolated transactions, but occurred regularly two or three times a week at least. Delivery of such shipments were made by plaintiff from time to time during his employment.

■ The power of Congress over interstate commerce "is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." Gibbons v. Ogden, 9 Wheat. 1, 196, 6 L.Ed. 23.

■ The Fair Labor Standards Act applies to any employee "who is engaged in commerce." It does not undertake to declare what degree of participation in interstate commerce will bring him under the provisions of the Act.

Apposite in this case are the words of the Supreme Court construing the National Labor Relations Act, that: "Examining the Act in the light of its purpose and of the circumstances in which it must be applied we can perceive no basis for inferring any intention of Congress to make the operation of the Act depend on any particular volume of commerce affected more than

that to which courts would apply the maxim de minimus." National Labor Relations Board v. Fainblatt, 306 U.S. 601, 607, 59 S.Ct. 668, 672, 83 L.Ed. 1014.

Similarly spoke the Circuit Court of Appeals for the Fifth Circuit in the case of National Labor Relations Board v. Gulf Public Service Co., 116 F.2d 852, 854, 855, that: "As we read the decisions which have construed the Act, we are constrained to the view that they hold that in providing machinery for the adjustment of labor disputes, the Congress fixed no standard of degree by the use of which it can be said, as a matter of power rather than of wise policy, that a particular amount of probable direct interference with interstate commerce is too little to come within its cognizance. Congress undoubtedly had the power to bring within the field of Congressional supervision, all direct interference with interstate commerce, no matter how slight. Unless therefore, we can find in the Act, some qualifying term which reduces its scope to less than the whole, we must, upon the question of the power of the board, construing the Act as it has been construed, hold that it extends to any and all enterprises, without regard to their magnitude, in which labor troubles might reasonably be said to have the probable effect of directly interfering with the free flow of any interstate commerce. Congress, in short, in entrusting the enforcement to the wise discretion of the board, spoke not quantitatively or fractionally or in terms of degree, but qualitatively and in comprehensive terms."

See, also, Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 467, 58 S.Ct. 656, 82 L.Ed. 954; National Labor Relations Board v. A. S. Abell Co., 4 Cir., 97 F.2d 951, 954.

While the above decisions relate to acts other than the Fair Labor Standards Act, nevertheless the reasoning is equally applicable to the latter act.

■ Having found that plaintiff was actually engaged to a substantial extent in interstate commerce because of his activities in delivering the drop shipments which were moving in interstate commerce and which amounted to a constant practice (National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 37, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352), I find under the above authorities, that he came within the provisions of the Fair Labor Standards Act and is entitled to a judgment against defendant for unpaid minimum wages and unpaid overtime compensation.

■ Overtime compensation of an employee must be computed on "the regular rate at which he is employed." If the compensation received by an employee is more than the minimum wage permitted by the Act, his regular rate would be that which he actually received; but if it is less than the minimum, then the minimum wage prescribed by the Act becomes the legal "regular rate," and is the base to be used not only in determining the minimum wage, but also the overtime compensation.

■ The term "regular rate at which he is employed" necessarily means a rate equal to or more than the minimum rate permitted by the Act. Any agreement for a lesser rate would be illegal and of no avail, since this provision of the Act, by operation of law, is read into and becomes a part of every contract of employment between parties subject to the Act, and makes a rate of wage, equal at least to the minimum provided, the "regular rate," and the only legal rate, regardless of what the parties may actually undertake to do.

Any other construction would make possible, in the lowest wage scales, the working of long hours overtime at a wage of overtime less than the minimum provided for the statutory hours. For example: Suppose an employee was working eighty hours a week at fifteen cents an hour, when the statute limited the hours to forty a week and prescribed a minimum wage of thirty cents an hour, then, unless the minimum wage prescribed by the Act is used as the basic rate, the employee would work forty hours regular time at thirty cents an hour and forty hours overtime at twenty-two and one-half cents an hour, which, of course, is a result entirely foreign to the intention of Congress and any fair construction of the Act.

From the evidence and pursuant to the foregoing conclusions, I find that plaintiff is entitled to judgment against defendant for $166.14 and a reasonable attorney's fee of $75, making a total of $241.14.

I further find, upon the facts as proved in this case, that intervenors were not engaged in interstate commerce and did not come under the coverage of the Fair Labor Standards Act and that, therefore, no

cause of action is alleged in their interventions which comes within the jurisdiction of this Court. I also find, upon the facts as proved in this case, that this Court has not jurisdiction over the cross-claim of defendant against Mr. Charles E. Kirby.

Whereupon, it is considered, ordered and adjudged that plaintiff do have and recover of the defendant two hundred forty-one dollars and fourteen cents ($241.14) and $——— costs of court.

It is further considered, ordered and adjudged that the interventions of Mr. Charles E. Kirby and Mrs. Rosalind S. Kirby, and the cross-claim of defendant against Charles E. Kirby, be, and hereby are dismissed for want of jurisdiction.