WALLING, Administrator of Wage and Hour Division, United States Department of Labor, v. MUTUAL WHOLESALE FOOD & SUPPLY CO. et al.

No. 548.

District Court, D. Minnesota,
Fourth Division.

Aug. 25, 1942.

Donald M. Murtha and James M. Miller, both of Minneapolis, Minn., and Roy C. Frank, of Washington, D. C. (Warner W. Gardner, Irving J. Levy, Mortimer B. Wolf, and Edward J. Fruchtman, all of Washington, D. C., of counsel), for plaintiff.

R. H. Fryberger, of Minneapolis, Minn. (George M. Burditt, of Chicago, Ill., of counsel), for defendants.

NORDBYE, District Judge.

While the facts are not particularly involved, a detailed summary seems necessary. Some years ago, a so-called chain stores operation under the name of C. Thomas Stores Sales System, Inc., was organized. Shortly prior to the commencement of this action, the corporate name was changed by amendment to C. Thomas Stores, Inc., and at the trial hereof, it was agreed that the pleadings might be amended accordingly. Therefore, the title herein has been changed to comply with the amendment agreed upon by the parties. During the early years of its existence, the company did its own wholesale buying. However, on or about January 1, 1935, the Mutual Wholesale Food and Supply Company (hereinafter referred to as Mutual) was organized to take care of the buying and distributing of merchandise handled by the Thomas Stores. It appears from the evidence that the primary purpose of organizing Mutual was to better the buying facilities of the Thomas Stores, in that some manufacturers were hesitant about selling direct to a chain system. At the time Mutual was organized, the C. Thomas Stores was operating its wholesale department at 311 Fifth Avenue North in Minneapolis. When Mutual was organized, it took over this wholesale space, and later purchased the adjoining building at 401 North Third

Street. Briefly, it may be stated that Mutual's business is primarily devoted to the purchase of merchandise which in turn is sold to the Thomas Stores, some fifty-seven in number, all located in Minnesota. Mutual handles a general line of staple foods and groceries. About 90% of the goods handled is distributed to the C. Thomas Stores, the balance is distributed to other retail stores in the State. In 1941, Mutual's gross sales approximated four million dollars, and it has some 50 employees, including warehouse men, truck drivers, and office employees. Mutual is divided into two departments—dry groceries and produce— the former representing approximately 75% and the latter 25% of the total volume of business. Shipments arrive at the warehouse by interstate rail and truck carriers. Some shipments arrive in pool cars consigned to the Merchandise Terminal Warehouse, Inc., the dock and unloading facilities of Mutual being used when the Merchandise Terminal is the consignee. Under such circumstances, the portion of the pool car belonging to Mutual is unloaded and moved directly into Mutual's part of the warehouse. Where pool cars are spotted at railroad team tracks, or the tracks of another wholesaler or broker, Mutual's truck drivers, or at times independent trucks, transport Mutual's portion to the warehouse. Goods coming directly to Mutual's warehouse by freight cars or trucks are generally unloaded by Mutual's employees, the merchandise placed on flats or warehouse trucks and moved into the warehouse. Records of incoming goods are kept by the receiving clerk.

Merchandise Terminal Warehouse, Inc. (hereinafter referred to as Merchandise Terminal), is a licensed warehouse company and has space in Mutual's warehouse. It pays rent for the space so occupied. The service it performs consists largely of the storage of sugar and other staple commodities, and for such services on behalf of Mutual it charges a certain stipulated warehouse rate. It also repackages goods for Mutual in its "Cello" department; that is, where goods are received by Mutual in units or packages too large for sale by the retail stores, the employees of Merchandise Terminal repackage and relabel the same in smaller units. They are then turned over to Mutual for distribution to local stores in the customary manner. As a public warehouse, Merchandise Terminal receives one or two pool car shipments per week. At least half of the pool cars contain goods billed to Mutual. The goods thus billed to Mutual are unloaded and stored in Mutual's warehouse, and the goods billed to other Minneapolis wholesalers are placed in the space allotted to the Merchandise Terminal until picked up by such wholesaler. The unloading of such shipments is generally taken care of by Mutual's employees. At times, Merchandise Terminal makes shipments to points outside of the State on orders from those who have stored goods or merchandise in its warehouse.

C. Thomas Stores, Inc. (hereinafter referred to as C. Thomas), employs some 12 people in the space occupied by it in Mutual's warehouse building. All requisitions from the retail stores are received by this central office so that they are informed as to the goods which the various retail stores desire to have Mutual send to them. These employees of C. Thomas make up the payroll for the employees of Mutual, Merchandise Terminal, Lawrence Warehouse, and of their own staff. Furthermore, the clerical work necessary to the keeping of records and accounts as between C. Thomas and Mutual is performed by C. Thomas' employees. The local stores from time to time do considerable local advertising, and all such advertising is handled through C. Thomas. Such advertising refers to products of manufacturers from both within and outside the State.

Lawrence Warehouse Company (hereinafter referred to as Lawrence) is a national concern engaged in so-called "field warehousing," a system devised to facilitate bank borrowings by wholesalers. Under this system, a three-party contract is entered into among and between Mutual, Lawrence, and a Minneapolis bank. Mutual is the pledgor and the bank is the pledgee. Lawrence is the pledge holder for the bank, taking physical possession of the pledged merchandise in a space or bay in Mutual's warehouse allocated to Lawrence. Goods valued not less than 133% of the loan received by Mutual from the bank are required to remain in Lawrence's possession. Additions and withdrawals are made as the loan increases or decreases. About 60% of all of the goods handled by Mutual is pledged and stored in Lawrence's bay. When goods are not available for filling requisitions of the local stores from Mutual's stock, the orders are filled from any available goods in Lawrence's stock. Under these circumstances, however, other

goods must be substituted for the goods withdrawn so that the merchandise which Lawrence holds will not be less than 133% of the outstanding loan. Lawrence receives a certain monthly remuneration for its services, and in addition Mutual reimburses Lawrence for all its labor costs and expenses. There are some five or six employees on Lawrence's payroll. They are principally engaged in checking the goods moving in and out of Lawrence's bay. They handle such merchandise as may from time to time be necessary and keep the clerical records. In that all such labor costs are paid by Mutual, a practice has grown up whereby the employees on Lawrence's payroll are frequently used to perform work for Mutual under the direction of Mutual's warehouse foreman.

The Bailey Food Merchandise Company (hereinafter referred to as Bailey Food) furnishes management service to the Mutual, C. Thomas, and Merchandise Terminal. It has no employees on its payrolls other than its officers and directors.

The Boards of Directors of the defendants Mutual, C. Thomas, Merchandise Terminal and Bailey Food are closely interlocked. L. W. Bailey holds the stock control of Bailey Food Merchandise Company; Bailey Food in turn controls Mutual, Merchandise Terminal, and C. Thomas.

In order to facilitate the movement of merchandise ordered by the local stores, each store manager is provided with a catalog and requisition sheets covering each item of goods handled by Mutual. These orders or requisitions are routed or handled through the office of C. Thomas, and then delivered to Mutual. When the necessary clerical work has been performed, the warehousemen are given the requisition lists and orders are filled from the stock in the so-called "line-up." The merchandise to be sent out is placed on flats or trucks and moved to the loading platform where it is loaded on Mutual trucks and moved by Mutual truck drivers to the local stores. Orders are sent in from the local stores, one to three times a week and the merchandise is usually sent out the following day. Ofttimes there are so-called "back-orders", that is, orders which have remained unfilled because of the absence of the required items of merchandise. At times, these back orders may be filled out of the incoming freight car or truck, or from the flats on to which goods have been recently unloaded. Where there are perishable items to be sent to the stores, it is not uncommon to load the trucks with the required items out of the incoming cars and trucks. It fairly appears that it is Mutual's policy to keep a supply of merchandise on hand to comply with needs of the local stores for approximately ten days. A relatively rapid turn-over is sought. The average turn-over for groceries is about fifteen times annually and for produce items about forty-five times annually.

The parties are in accord that the primary question presented is whether employees engaged in unloading and warehousing goods arriving from points outside the State and in the distribution of such goods to retail stores throughout the State of Minnesota are engaged in commerce within the purview of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. The Act applies to all employees "engaged in commerce". At the outset, therefore, it becomes necessary to determine the proper test to be adopted in ascertaining the coverage of the Act. Plaintiff assumes to support the position that all of the employees of these defendants facilitate the flow of goods moving in the stream of commerce, and therefore are engaged in commerce within the purview of the Act. It is urged that the Mutual's warehouse must be viewed as an "economic sluice for goods moving in commerce," similar to stockyards—Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229; tobacco warehouses—Mulford v. Smith, 307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092; or grain trading markets—Board of Trade of City of Chicago v. Olsen, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839. It is earnestly contended that the business of Mutual and the associated defendants is that of distribution and not storage, and that such business involves a continuous flow of extra-state goods through the warehouse to the stores by reason of the anticipated demands of the local stores. Plaintiff urges, therefore, that a practical concept of the term "commerce" should be adopted "attuned to the realities of business intercourse."

However intriguing the suggested analysis of commerce may be, the majority of the courts which have construed the Fair Labor Standards Act have refused to apply the "stream of commerce" test to analogous situations. While Congress undoubtedly has authority to regulate or control local activity which adversely affects interstate commerce, it did not use any lan-

guage in this Act which indicates that it enacted this legislation with that concept of commerce in mind. It is significant that it expressly limited the application of the Act to employment in commerce, or where goods are produced for commerce, or sold with knowledge that shipment in interstate commerce was intended. In Jewel Tea Company v. Williams, 10 Cir., 118 F.2d 202, the Act was held not applicable to certain route salesmen who were engaged in intrastate distribution of products originating outside the State, reversing the trial court which had found the salesmen to be engaged in interstate commerce because there was an uninterrupted stream of commerce moving from outside the State through a local warehouse and through these salesmen to the customer. The court stated (page 207 of 118 F.2d):

"Where goods are ordered and shipped in interstate commerce to meet the anticipated demands of customers without a specific order therefor from the customer and the goods come to rest in a warehouse, the interstate commerce ceases when the goods come to rest in the state. It does not continue until the demand eventuates in the form of an order and the merchandise is delivered to the retailer."

In Walling v. Goldblatt Bros., Inc., 7 Cir., 128 F.2d 778, the plaintiff presented the same theory of commerce as urged herein, and the factual situation is quite analogous hereto. In response to the suggestion that the stream of commerce test should be applied, the court stated (page 782 of 128 F.2d):

"Plaintiff insists, however, that those who move goods from the platform into the warehouse, those who store them in the proper places, those who take care of them there, those who deliver them to the Illinois stores, and those who do the clerical work involved in such storage and delivery are within the Act. Plaintiff argues that all these activities are merely part of the 'stream of commerce' from the place of origin to the retail stores. But we are not dealing with a typical 'current of commerce' case. The 'current of commerce' test arises in differently phrased statutes involving a wide flow of goods from one state to another through a throat or vent. United States v. Wrightwood Dairy Co., 315 U.S. 110, 62 S.Ct. 523, 86 L.Ed. ——; Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229; Swift &

Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518; Board of Trade of City of Chicago v. Olsen, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839; Currin v. Wallace, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441; Krueger v. Acme Fruit Co., 5 Cir., 75 F.2d 67. Here the language is different; the test is whether employees are 'in commerce.'"

In Jax Beer Co. v. Redfern, 5 Cir., 124 F.2d 172, 174, it was urged that the "stream of commerce" test should apply, and the Wage and Hour Division in its brief as amicus curiae stressed the language used in decisions under the National Labor Relations Act, 29 U.S.C.A. § 151, et seq. The court stated, however, that these decisions were not applicable for, as pointed out by the Supreme Court, "the 'critical words' of the National Labor Relations Act are 'affecting commerce'", and that the Fair Labor Standards Act does not employ the critical words "affecting commerce," but that it applies to employees "engaged in commerce."

This conclusion was reached by the same court in Swift & Co. v. Wilkerson, 5 Cir., 124 F.2d 176, and Fleming v. Jacksonville Paper Co., 5 Cir., 128 F.2d 395. The "stream of commerce" test has been rejected in Rauhoff v. Henry Gramling & Co., D.C.Ark.1941, 42 F.Supp. 754; Moses v. McKesson & Robbins, Inc., D.C.Tex. 1942, 43 F.Supp. 528; Brown v. Bailey, 177 Tenn. 185, 147 S.W.2d 105; Isbell v. Wood & Co. (Ala. Intermediate Civil Ct. of Birmingham, 1941), 4 Lab.Cas. 60,723.

While in the following cases the "stream of commerce" theory was not discussed, the courts did not apply the test, holding the Fair Labor Standards Act was not applicable to the intrastate distribution of goods originating without the State. Veazey Drug Co. v. Fleming, D.C.Okla.1941, 42 F. Supp. 689; Drake v. Hirsch, D.C.Ga.1941, 40 F.Supp. 290; Klotz v. Ippolito, D.C. Tex. 1941, 40 F.Supp. 422; Serio v. Dee Cigar & Candy Co., Inc., (Ala.Cir.Ct.1941) 4 Lab.Cas. 60,734; Jehs v. Singer Sewing Mach. Co., D.C.Okl.1941[1]; Higgins v. Carr Bros. Co., Me.1942, 25 A.2d 214; Gibson v. Glasgow, Tenn.Sup.1942, 157 S.W. 2d 814. See, also, Fleming v. American Stores Co., D.C.Pa.1941, 42 F.Supp. 511, where there was an alternative holding that the local distribution was within the retail store exemption; Gerdert v. Certified Poultry & Egg Co., D.C.Fla.1941, 38 F.Supp.

---

[1] No opinion for publication.

964; Eddings v. Southern Dairies, D.C.S. C.1942, 42 F.Supp. 664.

Plaintiff relies upon Fleming v. Alterman, D.C.Ga.1941, 38 F.Supp. 94, and Gavril v. Kraft Cheese Co., D.C.Ill.1941, 42 F. Supp. 702. In the Alterman case, the court relied heavily upon cases which interpret other statutes, such as the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., the Agricultural Adjustment Act of 1938, 7 U.S.C.A. § 1281 et seq., and the Tobacco Inspection Act, 7 U.S.C.A. § 511 et seq., without alluding in any particular to the difference in the wording and the evident scope of these statutes. In the Gavril case, the court relied upon an interpretation by the Federal Trade Commission of the Clayton Act, 15 U.S.C.A. § 12 et seq. and the Robinson-Patman Amendment thereto, 15 U.S.C.A. § 13(a), in concluding that a continuous, uninterrupted flow and current of commerce was the test of commerce under the Fair Labor Standards Act. However, this court likewise makes no mention of any differences in the wording of the acts compared. In addition, plaintiff asserts the applicability of the "stream of commerce" test used in the interpretation of the Natural Gas Act, 15 U.S.C.A. §§ 717–717w— Illinois Nat. Gas Co. v. Central Illinois Public Service Co., 314 U.S. 498, 62 S.Ct. 384, 86 L.Ed. 371; and the interpretation of interstate commerce in decisions construing anti-trust statutes—Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518; Binderup v. Pathé Exchange, Inc., 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308; United States v. General Motors Corporation, 7 Cir., 121 F.2d 376. However, all of these cases were considered by the Circuit Court of the Seventh Circuit in Walling v. Goldblatt Bros., supra, and they were distinguished from the statute that Congress enacted herein. In regard to the General Motors Case, supra, which was decided by the Seventh Circuit, the court dismissed the alleged analogy of that holding in the interpretation of the present statute by stating (page 783 of 128 F.2d):

"* * * The General Motors case had to do with 'restraint of commerce.' We held merely that what occurred prior to delivery to the consumer was properly considered in determining whether there had been, 'restraint of commerce,' not that employees of the dealer were in commerce."

In view, therefore, of the manifest weight of authority which rejects the "stream of commerce" test in similar situations, we pass to consider when interstate commerce ceases in the activities carried on by the defendant companies whose employees may at times be engaged in such commerce.

When extra-state goods are shipped to Mutual and Merchandise Terminal, it is evident that the destination intended by the parties is the warehouse. It is there these shipments come to rest. That is the end of the journey across the state line. Certainly, any other destination was not known or contemplated when the shipment was delivered to the carrier at the point of origin. The other handling of the merchandise, therefore, would be a local transaction. There is no evidence or contention that the ordering of goods by Mutual and Merchandise Terminal was in response to any particular previous requisition therefor, or that any certain extra-state shipments were to be destined to any other destination except the warehouse. Anticipation of demands of the local stores herein do not differ from the comparable moving of goods from any wholesale warehouse or wholesale house to its customers. The corporate set-ups of Mutual, Merchandise Terminal, C. Thomas, and Bailey Food are bona fide and were undoubtedly devised to facilitate and improve the handling of the business and operations of the concerns named. The plan of handling the business, the management, the financial arrangements, and all other details were in existence before the adoption of the Fair Labor Standards Act, and it is not suggested that the system of doing business in the use of various corporations in facilitation thereof was set up or devised in order to evade the Act. C. Thomas is not only a separate corporation, but it does not have the same stockholders as Mutual, nor do the parties hold stock in them in the same proportions. Its business is primarily the sale of merchandise at retail to customers in the State of Minnesota. It pays a separate income tax, maintains separate payrolls, reports separately on its social security taxes, and is in every way a separate and distinct institution.

In giving a practical and realistic construction to the language used by Congress in this Act, it seems evident that interstate commerce must end at some time. Otherwise, it would be just as logical to urge that interstate commerce continues until the merchandise reaches the consumer because, forsooth, the goods never came to rest in the retail stream on account of

the rapid turn-over between the delivery to the local stores from the warehouse and the ultimate delivery to the consumer. In determining when interstate commerce ends, we have the views of three Circuit Courts of Appeal which have recently expressed their views thereon.

In the Fifth Circuit, in Fleming v. Jacksonville Paper Co., supra, page 398 of 128 F.2d, the court stated:

"Without reviewing the multitude of decided cases as to when interstate transportation ends, we are justified in holding that after imported goods are delivered to and received by the importer, and become part of his property held within the State subject to his disposition, whether in the original containers or not, the subsequent sale and delivery of them within the State is intrastate commerce. The typical case is a stock of goods in a warehouse awaiting sales. It does not matter that the goods were imported with a view to selling them afterwards to particular customers, or that according to past experience they would likely be sold to them, or would surely be sold to someone very soon. If they come to rest in the hands of the importer, they have ceased to be in interstate commerce because of their importation, and his employees thereafter engaging solely in selling them within the State are not employed in interstate commerce."

In the Seventh Circuit, in Walling v. Goldblatt Bros., supra, the defendant owned and operated three warehouses in Chicago, at which it received merchandise from some 45 states and from which it thereafter distributed goods to some seven department stores which it owned in the City of Chicago. These department stores sell at retail and the warehouses were necessary "implements of defendant's business in buying, receiving, storing and distributing goods." Further, it appeared that merchandise was received at the warehouses daily and shipped from day to day to the retail stores. In determining when interstate commerce ceased so as to ascertain which employees were under the Fair Labor Standards Act, the court arrived at the following conclusion (page 782 of 128 F. 2d):

"Where orders are solicited within a state and the goods are shipped from without the state directly to the customer or to an agent for delivery to the customer the transactions are a part of interstate commerce until the goods reach the customer.

Jewel Tea Co. v. Williams, 10 Cir., 118 F. 2d 202, 206, and cases there cited; Binderup v. Pathé Exchange, Inc., 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308; Federal Trade Commission v. Pacific States Paper Trade Ass'n, 273 U.S. 52, 47 S.Ct. 255, 71 L.Ed. 534. But here there were no such prior orders. Defendant knew in advance from its records, in a general way, the needs of the retail stores and acted accordingly. But defendant was not relying on existing orders from its stores or customers. The goods arrived at the warehouses and came to rest. They were not destined for any specific customer or store. The mere fact that an anticipated local transaction causes movement in interstate commerce is not sufficient to constitute the wholly local transaction after arrival a part of commerce. Jewel Tea Co. v. Williams, 10 Cir., 118 F.2d 202, 207, and cases there cited; Lipson v. Socony Vacuum Corp., 1 Cir., 87 F.2d 265, 267. Where goods are delivered to the buyer to be sold later and delivered to intrastate buyers subsequent acts are not commerce. Jax Beer Co. v. Redfern, 5 Cir., 124 F.2d 172, 174; Swift & Co. v. Wilkerson, 5 Cir., 124 F.2d 176; Jewel Tea Co. v. Williams, 10 Cir., 118 F. 2d 202; Gerdert v. Certified Poultry & Egg Co., D.C., 38 F.Supp. 964; Veazey Drug Co. v. Fleming, D.C., 42 F.Supp. 689; Klotz v. Ippolito, D.C., 40 F.Supp. 422; Foster v. National Biscuit Co. [D.C.], 31 F.Supp. 552; Lipson v. Socony Vacuum [Corp.], 1 Cir., 87 F.2d 265; Atlantic Coastline R. [Co.], v. Standard Oil, 275 U.S. 257, 48 S. Ct. 107, 72 L.Ed. 270; Winslow v. Federal Trade Commission, 4 Cir., 277 F. 206; Fleming v. Arsenal Bldg. Corp., D.C., 38 F.Supp. 207; Rauhoff v. Henry Gramling & Co., D.C., 42 F.Supp. 754."

See, also, Jewel Tea Co. v. Williams, supra.

■ Undoubtedly, there are certain employees of some of these defendants who are engaged in interstate commerce and others in intrastate business. It seems quite elementary that the unloading and checking in of merchandise received through the channels of interstate commerce by a wholesale house is work in commerce within the purview of the Act. Fleming v. Jacksonville Paper Co., 5 Cir., 128 F.2d 395; Fleming v. American Stores Co., D.C.Pa.1941, 42 F.Supp. 511; Jax Beer Co. v. Redfern, 5 Cir., 124 F.2d 172; Walling v. Goldblatt Bros., 7 Cir., 128 F.2d 778; Gibson v. Glasgow, Tenn.Sup.1942, 157 S.

948

W.2d 814; *Klotz v. Ippolito*, D.C.Tex., 40 F.Supp. 422.

But the work of employees engaged in the warehousing or storing and the intrastate distribution of merchandise at one time received through the channels of interstate commerce is not work in commerce within the legislative intent. *Fleming v. Jacksonville Paper Co.*, supra; *Walling v. Goldblatt Bros.*, supra; *Jewel Tea Co. v. Williams*, supra; *Moses v. McKesson & Robbins, Inc.*, supra; *Drake v. Hirsch*, supra; *Eddings v. Southern Dairies, Inc.*, supra; *Higgins v. Carr Bros. Co.*, supra; *Isbell v. Wood & Co.*, supra. In that Mutual receives merchandise in many different ways, it becomes necessary to examine and determine which ways are in interstate commerce. The defendants have introduced a series of charts marked Defendants' Exhibits PP through WW, inclusive, in which are classified the merchandise of all classes which Mutual receives. The various categories may be stated as follows, the numbering and lettering conforming to that of the charts:

■ 1-A (w). Merchandise produced and delivered within the State. Since this merchandise never left the State, it is clear that the receipt thereof could not be in commerce.

■ 1-A (x). Merchandise delivered from manufacturers' local warehouse stock. There has been no showing that Mutual was the intended destination of this merchandise when it was shipped in interstate commerce. Moreover, there is no testimony that such shipments did not "come to rest" in the manufacturers' local warehouse. These deliveries, therefore, to Mutual would be intrastate in character.

■ 1-A (y) Drop shipments originating in the State. By its very terms, this class includes only such merchandise which was not intended for delivery to Mutual until it was already in the State, if perchance it ever was without the State. The movement is not in interstate commerce.

■ 1-A (z). Purchases from Minnesota farmers or producers by or for Mutual's account. This merchandise never crossed State lines and is not in interstate commerce.

■■ 1-B. Carload shipment consigned to others delivered to Mutual after arrival in State: 1-C. Pool cars consigned to others, purchase made and billed from within the State; 1-D. Pool car consigned to others, purchased from within the State, billed from without the State. These three classes will be considered together. It is quite impossible to tell from the chart or the testimony whether delivery was intended to Mutual in all instances when the merchandise may have been shipped in interstate commerce. It may be argued that because of the fact that the car was consigned to others than Mutual, delivery to Mutual therefore was not intended. But this assumption, of course, is not conclusive. It does appear from the testimony that at times carloads of groceries would be purchased by Mutual after arrival in the State and then would be spotted at Mutual's warehouse. Then, again, merchandise might be shipped to others than Mutual where the shipment was not in response to an order from Mutual. An instance of this type would arise where the consignee refused the shipment, and then, after arrival, arrangements were made with Mutual for its purchase. It would seem that if the shipment had "come to rest," the interstate character of the shipment had probably ceased. However, types of shipments in the categories just discussed were relatively few. There is testimony that there would be purchases of produce where orders would be placed with a broker or producer, and that in response to those orders produce would be shipped into the State consigned to the jobber or producer. Mutual would be notified, and after inspection, it would accept or reject the shipment. Delivery to Mutual being intended when the merchandise was shipped in interstate commerce, this shipment obviously would be in commerce until it was unloaded at Mutual's warehouse. The right of rejection would be immaterial, and whether the billing was from within or without the State would be immaterial, in so far as its effect upon the character of the shipment was concerned.

■ 1-E. Pool cars consigned to Mutual. Here, it is apparent that it was intended that the goods should be delivered to Mutual when the goods were shipped from outside the State. The merchandise, therefore, was in interstate commerce when delivered to Mutual, and the employees engaged in unloading such cars and checking the merchandise were therefore engaged in interstate commerce.

■ 1-F. Full or split cars, sight draft, bill of lading. It is assumed that Mutual was the destination intended when merchandise under this classification was

shipped. The fact that it was shipped on a sight draft bill of lading is immaterial for the purpose of determining whether it was in interstate commerce at time of arrival. Shipments received in this manner by Mutual would be in interstate commerce.

2. Merchandise originating outside of the State, unloaded into warehouse by truck carrier, express, railroad store door delivery. Since this merchandise is unloaded into the warehouse or on to the docks of Mutual by employees of the carrier, it must be assumed that this was the destination intended at the time the merchandise was shipped in interstate commerce, and therefore its interstate character ceased upon its delivery. Any subsequent handling of this merchandise is not in interstate commerce.

3. Railroad shipments originating out of the State f.o.b. Minneapolis. Mutual's warehouse is apparently the destination intended when this merchandise is shipped, and therefore it is still in interstate commerce when received at the warehouse. The question of who pays the freight is immaterial.

4. Rail shipments originating out of the State f.o.b. shipping point. These shipments are clearly in interstate commerce when received by Mutual at its warehouse.

5. Drop shipments from out of the State. Testimony on this item was to the effect that drop shipments were made direct to the retail stores and not through the warehouse of Mutual. Since none of Mutual's employees handles these shipments, they are immaterial in this action. It is not contended that the employees at the retail stores who may have handled these shipments are engaged in interstate commerce.

To summarize, therefore, it may be stated that categories 1-E, 1-F, 3 and 4 are classes in which merchandise arrived at Mutual's warehouse in interstate commerce and that a portion of the merchandise arriving in classes 1-B, 1-C and 1-D may have been in interstate commerce when it arrived, but the exact amount of interstate commerce in these classes has not been proved with definiteness. Taking the percentage given on Defendants' Exhibit UU, in so far as it refers to classes 1-E, 1-F, 3 and 4, it would appear that at least 17.96% of the merchandise coming into Mutual's warehouse is in interstate commerce at the time it is handled by the employees in unloading. While this percentage may be relatively small as compared to the total shipments, it is not so insignificant that the Court should apply the de minimis doctrine. Muldowney v. Seaberg Elev. Co., D.C.,N.Y.1941, 39 F. Supp. 275; Nelson v. Southern Ice Co., Inc., (D.C.Tex.1941).[1]

Reference has been made to the filling of back-orders and the occasional practice of unloading some merchandise from incoming cars on to the trucks for transportation to the local stores. The proportion of such instances is indefinite, and whether any particular shipment was in interstate commerce when it was spotted at the Mutual loading platform is likewise uncertain. However, the back-orders must be entered upon the perpetual inventory machine before merchandise involved is moved to the local stores. All additions and withdrawals are reflected on the perpetual inventory and some form of an order sheet or invoice necessarily accompanies the goods going to the local stores. It is fair to find, therefore, that many of the shipments figuring in such transactions came to rest in interstate commerce before any transportation to the stores began. When perishable goods are unloaded on to waiting trucks from railway cars, the merchandise must likewise be entered upon Mutual's perpetual inventory, and substantially the same book routine is followed as pertains to the goods moved from the warehouse stock. Consequently, the observations made with reference to the filling of back-orders are pertinent and applicable to such occurrences. While, strictly speaking, there may be times when the unloading from cars directly on to the trucks may be classed as work in interstate commerce, the instances are comparatively infrequent and such activities alone should not place an employee in interstate commerce if the rest of his work is all of an intrastate character. That is, the evidence discloses that there are occasions when the loaders of outgoing trucks may take a small portion of the load directly from a car which is being unloaded on to Mutual's loading platform. A loading of isolated items of merchandise under such circumstances, in light of the character of the

---

[1] No opinion for publication.

**950**

evidence herein, would not place such employees in interstate commerce.

It is apparently well recognized that some employees of an employer may be subject to the Act, while others are not. Manifestly, it will be difficult on the evidence submitted to determine with exactness the precise status of the daily activities of the various employees of these defendants in so far as their activities being in or outside of interstate commerce are concerned. In Interpretative Bulletin #5, the Administrator has ruled that "in determining the applicability of the Act, the work week is to be taken as the standard." Apparently, therefore, it is the Administrator's view that if any employee during any week is engaged in interstate commerce to any extent, he is entitled to the benefits of the Act. According to this interpretation, it would be immaterial that, during some part of that week, he was engaged in work not in interstate commerce. Presumably, it would be possible for an employee to be under the Act one week and outside its benefits the next, and the burden would rest on the employer to properly segregate the activities of any employee so that violation of the Act would not occur. Recognizing that some practical standards must be used to facilitate the task of the employer in this regard, the rulings and interpretation of the Administrator are approved as fair and reasonable and are adopted herein.

In order that the views reflected herein may be applied to the factual situation and thus assist the parties in determining the applicability of the Act to the various employees of the defendants who may be under the Act, the following observations may be made:

Office employees. Warehousing, storage, and intrastate shipments of merchandise thereafter, are not in interstate commerce, hence employees who keep inventories, records, payrolls, etc., are not engaged in interstate commerce. Drake v. Hirsch, D.C.Ga.1941, 40 F.Supp. 290; Swift & Co. v. Wilkerson, 5 Cir., 124 F.2d 176; Serio v. Dee Cigar & Candy Co., Inc., Ala. Cir.Ct.1941, 4 Lab.Cas. 60,734. See, also, Abadie v. Cudahy Packing Co. of Louisiana, D.C.La.1941, 37 F.Supp. 164. In regard to the status of these employees, it may be pointed out that there is maintained a perpetual inventory of Mutual's stock on hand by use of a machine system in keeping the books, records and writing up of orders. Any records, therefore, maintained and kept in the office are primarily in relation to the merchandise in the warehouse and to record the withdrawals and additions so as to reflect the merchandise on hand and to aid in determining whether requisition orders from the local stores may be filled. Generally speaking, these records do not concern any item of merchandise until the interstate character of any shipment has come to rest. Certain office employees may handle telephone calls which cross State lines and mail from out of the State, but, generally speaking, their work has reference to local business and the Act does not encompass such activities. Any other view would unduly expand our present concepts of interstate commerce as used in the Act.

Employees who order goods for shipment in interstate commerce. The following cases, are authority for the holding that the ordering of goods from a State to be transported and introduced into another State is a part of interstate commerce and is within the Act. Eddings v. Southern Dairies, supra, Walling v. Goldblatt Bros., supra; Fleming v. Jacksonville Paper Co., supra; Fleming v. American Stores Co., supra. It seems reasonably clear that the services rendered by such employees concern the movements of merchandise in interstate commerce as fully as those who aid in its transportation and movement by physical handling.

Night watchmen and maintenance men. Plaintiff cites many cases holding that watchmen and maintenance men are covered by the Act. However, an examination of these authorities indicates that they primarily deal with situations wherein the employer was engaged in shipping merchandise in interstate commerce or producing goods for interstate commerce. In such cases, the courts bottom their conclusions upon the fact that such occupations were necessary to the production of goods for commerce. However, herein the goods in the warehouse are not in commerce. In the main, the services performed by these employees concern merchandise where the interstate commerce feature has ceased. It follows that they are not engaged in commerce under the Act. There is testimony, however, that Merchandise Terminal has at times shipped merchandise in interstate commerce. However, Merchandise Terminal has, except for the employees in the Cello department, only

one employee. Such employee, in so far as he unloads interstate shipments, or performs services in connection with the shipping out of merchandise in interstate shipments, is engaged in interstate commerce. While the testimony is somewhat indefinite as to the present remuneration received by such employee, it did appear at one time, at least, that such employee received less than $30 per week and performed more than 20% of his work in services similar to that performed by non-exempt employees. Under these circumstances, he would not be an executive, and hence in so far as his work pertains to interstate commerce, he would be subject to the Act.

■ Truck drivers. Since it has been determined that the intrastate distribution of merchandise which comes to Mutual's warehouse through the channels of interstate commerce is not "in commerce" within the meaning of the Fair Labor Standards Act, it follows that the drivers of the trucks hauling the merchandise in the intrastate distribution are not engaged "in commerce." This conclusion is further supported by the decision of the Interstate Commerce Commission in Ex Parte No. M.C.-3 (1941) 23 M.C.C. 1, where it stated:

"A merchant such as a wholesale grocer frequently has merchandise transported by rail from points in other states. This transportation is, of course, interstate in character. When the goods, however, are received by the wholesaler, the interstate transportation ordinarily is terminated if no destination beyond was definitely known and intended when the shipment was delivered to the rail carrier at the point of origin. Atlantic Coast Line R. Co. v. Standard Oil Co., 275 U.S. 257 [48 S.Ct. 107, 72 L. Ed. 270]. If later the merchant sells the goods and delivers them in his own trucks to points within the state, such transportation by motor vehicle, in our opinion, would be intrastate in character not subject to the Act. The motor vehicles employed in such transportation and the drivers thereof would not be subject to the regulations herein prescribed."

■ There is testimony here, however, that the truck drivers haul merchandise from the team tracks, the Fruit Auction Mart, and other warehouses. In as much as it has already been determined that at least some of the shipments received in this manner were intended for delivery to Mutual at the time they were shipped in interstate commerce, it follows that the drivers engaged in hauling such merchandise to Mutual's warehouse were then engaged in interstate commerce. The testimony as to whether any particular truck driver hauled an interstate shipment to Mutual's warehouse is very indefinite and inconclusive. It is apparent that some shipments were so hauled, although it probably constitutes a small portion of the merchandise received by Mutual.

Plaintiff asserts that, even though the truck drivers are engaged in interstate commerce, the exemption contained in Section 13(b) (1) of the Fair Labor Standards Act, 29 U.S.C.A. § 213(b) (1), is not applicable for two reasons: (1) That the finding of a "need" to regulate such drivers is a condition precedent to the existence of power in the Interstate Commerce Commission to regulate; and (2) that the Interstate Commerce Commission has held that it lacks the power to regulate such drivers. While plaintiff asserts that the Commission has not found a "need" to regulate drivers of private carriers engaged in interstate commerce, Wage and Hour Division Interpretative Bulletin #9, 4th Revision, March, 1942, p. 4, states:

"On May 1, 1940, it was held by Division No. 5 of the commission in a proceeding entitled 'Ex Parte No. M.C.-3' that a need exists for the regulation by the commission of private motor carriers engaged in interstate or foreign commerce."

Not only has the Interstate Commerce Commission not disclaimed power over private motor carriers engaged in interstate commerce, but it has established regulations which became effective October 15, 1940. See, Interpretative Bulletin #9, Wage and Hour Division, 4th Revision, March, 1942, par. 5, page 4.

■ It seems clear, therefore, that in so far as the truck drivers are engaged in interstate commerce, they are exempt from the overtime provisions of the Act by virtue of Section 13(b) (1). However, as to records to be kept and the minimum wages to be paid, the Fair Labor Standards Act would apply. It may be pointed out that the Administrator in Interpretative Bulletin #9, in discussing this subject, stated:

"The Interstate Commerce Commission expressly declined to take jurisdiction over drivers employed by wholesalers operating wholly within a State, except as to those drivers engaged in activities subject to the Motor Carrier Act, such as transportation

952

to or from a rail head of goods in transit to or from another State."

 Whether the transportation is from a rail head of goods in transit from another State, or from any other terminal where goods are still in commerce, would seem to be without any distinction in so far as the Act is concerned. In other words, applying the Administrator's own interpretation of the Act to truck drivers engaged in moving interstate shipments from railroad freight depots or any other type of terminal or stopping place, if the goods are still in interstate commerce and the destination is Mutual's warehouse, the transportation from such terminal to Mutual's warehouse would be services performed in the movement of goods in interstate commerce, and hence the truck drivers to that extent would be under the Motor Carrier Act, 49 U.S.C.A. § 301 et seq. Furthermore, in so far as it may aid Mutual in its responsibility of segregating the types of employment in which its employees may be engaged, the following interpretation of the Administrator found in the same bulletin, on page 6 thereof, may be referred to:

"It must be pointed out, however, that in any work week in which such driver (except in situations discussed in par. 5(c) of the Bulletin) engages in transportation subject to the jurisdiction which the Interstate Commerce Commission has asserted over such drivers, he will be considered as within the exemption provided by Section 13(b) (1) and thus not subject during the entire week to the maximum hour provisions of the Fair Labor Standards Act."

See, also, Note 11 under this interpretation.

Unloaders and Checkers. Wherever employees of either Mutual or Merchandise Terminal check in merchandise or are required to unload merchandise moving in interstate commerce, whether the same comes in railway cars, trucks or otherwise, such work is within the Act and the employees entitled to the benefit thereof. Likewise, the loaders of cars or trucks carrying merchandise and the checkers of such merchandise to be transported out of the State, are within the Act.

Scope of the Injunction. The evidence does not warrant the issuance of an injunction against Lawrence, Bailey Food, or C. Thomas Stores. Lawrence is engaged solely in field warehousing. It engages in no interstate activities whatsoever. Any employees on its payroll who may perform duties of the other defendants which involve commerce will be covered by the injunction to be issued herein against such defendant or defendants. It will be remembered that all of Lawrence's employees are paid by Mutual. Bailey Food's employees include only executives and administrative officers, and hence are not subject to the Act. C. Thomas Stores is a retail concern. Its business is primarily retail sales, and its office help are not engaged in commerce. Injunction will lie, however, together with the other relief prayed for herein, against Mutual Wholesale Food & Supply Company and Merchandise Terminal Warehouse, Inc. Costs are to be allowed in favor of plaintiff. An exception is reserved to plaintiff and the defendants Mutual and Merchandise Terminal.

Findings of fact and conclusions of law in harmony herewith, and the form of injunctive decree to be entered, may be submitted by the plaintiff upon five days' notice.